SKEFFINGTON v. BRADLEY.

1. PHYSICIANS AND SURGEONS—MALPRACTICE—CUSTOMARY, PRACTICE. Recovery in action for malpractice may not be had, where allegation of malpractice is not supported by medical testimony showing or tending to show that what defendant did or omitted doing was contrary to customary practice by reputable members of the medical profession practicing under similar conditions, and defendant's professional conduct was not so gross as to be within the comprehension of laymen.

REFERENCES FOR POINTS IN HEADNOTES

[1–3] 41 Am Jur, Physicians and Surgeons §§ 128–131.
Necessity of expert testimony to support an action for malpractice against a physician or surgeon. 141 ALR 5.
Proximate cause in malpractice cases. 13 ALR2d 11.
[4, 5] 41 Am Jur, Physicians and Surgeons §§ 79, 82.
[6] 3 Am Jur, Appeal and Error §§ 1027–1032.
[7] 53 Am Jur, Trial § 967.

2. SAME—PROFESSIONAL SKILL.

The unskillfulness, negligence, or failure to do that which ought to be done by one who professes special knowledge strictly involving professional skill and attention must be shown by the testimony of those learned in such matters in order to recover in an action for malpractice.

3. SAME—MALPRACTICE—QUESTION FOR JURY.

An action against a physician or surgeon for malpractice cannot be submitted for jury determination in the absence of qualified testimony showing or tending to show that what he did was contrary to the practice in that or similar communities, or that he omitted to do something which was ordinarily done in that or similar communities.

4. SAME—STANDARD OF CARE—JUDGMENT IN HEALING ARTS.

A consulted and treating physician is not a warrantor of cure or of accurate diagnosis as the physician is responsible in damages for unfortunate results when and only when it is shown, in a nonexceptional case, that he has departed from that standard of care which is known as customary medical practice and is attested by professional testimony, a large measure of judgment entering into the practice of the healing art, a judgment which should be free to operate in the best interests of the patient.

5. SAME—OBSTETRICIAN—MILK LEG—MALIGNANCY.

Defendant obstetrician who had satisfactorily delivered, one after the other, 2 babies for plaintiff husband and wife, and who mistook shortly after the second birth, a swiftly spreading malignancy of ultimately fatal nature for the condition known as *milk leg* which commonly follows pregnancy *held*, as a matter of law, not guilty of malpractice, notwithstanding defendant knew of an injury to the leg that had occurred prior to the first birth.

6. APPEAL AND ERROR—EVIDENCE.

Reversible error may not be predicated upon the admission or rejection of testimony which, in or out of the case, could not have affected the result.

7. SAME—DENIAL OF MISTRIAL—FUGITIVE WITNESS—MALPRACTICE.

The denial of plaintiffs' motion for mistrial in their action against defendant obstetrician for malpractice because a subpoenaed medical witness had fled to Canada for a vacation until the trial was over *held*, not reversible error, where it does not appear that such witness would have furnished testimony resistive of defendant's motion for directed verdict.

Appeal from Genesee; Roth (Stephen J.), J. Submitted April 12, 1962. (Docket Nos. 43, 44, Calendar Nos. 49,356, 49,357.) Decided May 18, 1962.

Case by Margaret Christina Skeffington against Robert M. Bradley for malpractice in failure to properly diagnose cancer. Derivative suit by Francis Joseph Skeffington for medical expense. Cases consolidated for trial and on appeal. Directed verdicts and judgments for defendant. Plaintiffs appeal. Affirmed.

*Mansour, Leech & Leech* (*Anthony J. Mansour* and *Walter L. Leech,* of counsel), for plaintiffs.

*Moll, Desenberg, Purdy, Glover & Bayer* and *Cline & George,* for defendant.

Black, J. The assembled and settled rules written most recently in *Lince* v. *Monson,* 363 Mich 135, require affirmance of these judgments for the defendant medical doctor. Plaintiffs' allegation of malpractice is not supported by medical testimony showing or tending to show that what the defendant did or omitted doing was contrary to customary practice by reputable members of the medical profession practicing under similar conditions. Neither do their presented cases admit consideration of exceptions characterized generally by professional conduct "so gross as to be within the comprehension of laymen" (see annotation 141 ALR 5, 12 and treatment of such exceptions in *Lince,* pp 141, 142). And it is not claimed, as in *Stewart* v. *Rudner,* 349 Mich 459, that the defendant contracted with either plaintiff, one being the doctor's patient and the other her husband, to provide specific medical treatment.

We have held, in *Zoterell* v. *Repp,* 187 Mich 319, 330 (quoted and followed in *Lince, supra,* 140):

"As to those matters of special knowledge strictly involving professional skill and attention, unskillfulness, negligence, or failure to do that which ought to be done must be shown by the testimony of those learned in such matters."

Later, in *Delahunt* v. *Finton,* 244 Mich 226, 230 (likewise followed in *Lince, supra*), it was held that a case of alleged medical malpractice cannot be submitted for jury determination in the absence of qualified testimony showing or tending to show that what the defendant physician or surgeon did "was contrary to the practice in that or similar communities, or that he omitted to do something which was ordinarily done in that or similar communities."

The most persuasive reason for this legally necessitous rule was considered at length in Professor McCoid's contribution to the recent "Symposium on Professional Negligence" which appears in 12 Vanderbilt L Rev 535–824. Turning to page 608 of the reference* we find this helpful exposition:

"The 'preferred position' granted by the courts to the medical profession (and to other professions) may be in recognition of the peculiar nature of the 'professional' activity. The qualified practitioner of medicine has undertaken long years of study to acquire knowledge of man, his body and its illnesses and the means of combatting such ailments, coupled with an intensive training of the senses and mind of the physician to respond to stimuli in a manner best described as 'the healing art.' A large measure of judgment enters into the practice of this art. That judgment should be free to operate in the best interests of the patient. If the 'judge' is himself to be judged by some outsider who relies on after-acquired knowledge of unsatisfactory results or unfortunate consequences in reaching a decision as to liability,

---

* Professor McCoid's portion, The Care Required of Medical Practitioners, commences on p 549.—REPORTER.

the medical judgment may be hampered and the doctor may become hesitant to rely upon his developed instinct in diagnosis and treatment. If, on the other hand, the doctor knows that his conduct is to be evaluated in terms of what other highly trained medical practitioners would have done or would accept as competent medical practice, he is more likely to pursue his own judgment when he is confident of the diagnosis and line of treatment, and is more likely to provide good medical service for his patient. While no absolute proof of the deterring effect of a nonprofessional standard of conduct is available, the concern expressed by doctors at the growing number of malpractice claims and some statements of hesitancy to engage in free use of medical judgment support this conclusion."

One's consulted and treating physician is not a warrantor of cure or of accurate diagnosis. He is responsible in damages for unfortunate results when and only when it is shown, the case being nonexceptional as noted above, that he has departed from that standard of care which is known as customary medical practice and is attested by professional testimony. Here, there being no such testimony, plaintiffs have established only that the defendant, an obstetrician who had satisfactorily delivered, one after the other, 2 babies for the plaintiff husband and wife, mistook shortly after the second birth a swiftly spreading malignancy of ultimately fatal nature[*] for the condition known as "milk leg" which commonly follows pregnancy. That is not sufficient to make a case of actionable medical malpractice.

Here are the facts, stated with due favor to the cases which, upon defendant's motion for directed verdict, were taken from the convened jury and resolved by judgments against the plaintiffs.

·· * We were informed, during oral argument, that Mrs. Skeffington deceased after these appeals were taken.

Mrs. Skeffington, the plaintiff wife, was a registered nurse. She had been working regularly at St. Joseph's Hospital in Flint. Her left leg was injured in 1954. Shortly after a Dr. Branch, of Flint, performed an arthrotomy on the leg. In 1957 the defendant, an obstetrician by training and specialty practice, delivered her first baby. In June of 1959 he delivered her second baby. In both instances he knew of her more or less chronic leg condition. June 30, 1959 Mrs. Skeffington went to defendant's office for her postparturitive checkup. At conclusion of the checkup defendant gave her a slip certifying ability to return to work as a nurse. About one week after she resumed work Mrs. Skeffington, having trouble with the leg, was ordered by her supervisor to cease work until she was in better physical condition. Mrs. Skeffington thereupon called defendant for an appointment and advised him respecting swelling and soreness of the leg. He told her to elevate it, stay off her feet for 3 weeks, and then report to him. Defendant told Mrs. Skeffington, in response to her then question, that she need not come to his office and that she should "just stay off the leg." Mrs. Skeffington testified that she relied upon defendant's advices and did not then, as otherwise she would have done, consult other doctors. Her claim was that her leg might well have been saved had defendant then referred her to others for general examination and diagnosis.

July 28, 1959 Mrs. Skeffington went to defendant's office. He concluded again, as he had previously done, that she was suffering from milk leg. He noticed in the course of such examination a dark spot about the size of a dime, on her thigh. He certified again that she was able to work and she resumed work a few days later.

October 25, 1959 Mrs. Skeffington, having experienced more and more trouble with the leg, consulted

Dr. W. Claire Baird, of Flint. The spot appeared to be getting larger and the leg was giving serious trouble. At that time defendant, having been called in, looked again at the leg and found that it differed markedly from the condition as it appeared when he last examined it. Dr. Baird, suspecting cancer, suggested that Mrs. Skeffington be admitted to the hospital for further examination. Such examination disclosed malignant cancer which, despite prompt treatment and effort, had spread so quickly as to require almost total amputation.

To summarize: No one, the record considered, can say that other reputable practitioners—consulted in like circumstances—would have diagnosed, or probably would have interpreted, Mrs. Skeffington's condition differently than did Dr. Bradley. No one can say, the same record viewed, that even an accurate diagnosis, made shortly after the second birth, would or could have warded off the ultimate tragedies of amputation and death. All we can say, necessarily utilizing the benefit of hindsight, is that Dr. Bradley made one of those occasional mistakes which even the most skilled of professional men do make as they proceed with the trial-and-error work they have chosen. Such a mistake is not actionable in the medical field unless it is shown by competent medical testimony that the acts or omissions of the accused doctor were contrary to "customary medical practice."

We have not overlooked plaintiffs' remaining allegations of error. All but one have to do with the admission and rejection of testimony which, in or out of the case, could not have affected the result. So far as plaintiffs' denied motion for mistrial is concerned, it does not appear that the subpoenaed medical witness who, having been served, fled to Canada for a "vacation" until the trial was over, would have

furnished testimony resistive of defendant's motion for directed verdict.

The judgments for defendant are affirmed.   Costs to defendant.

CARR, C. J., and DETHMERS, KELLY, KAVANAGH, SOURIS, OTIS M. SMITH, and ADAMS, JJ., concurred.