## MILES *v.* Van GELDER.

1. PHYSICIANS AND SURGEONS—MALPRACTICE—EXPERT EVIDENCE.

    Ordinarily expert evidence is essential to support an action for malpractice against a physician or surgeon.

2. SAME—MALPRACTICE—HISTORY—HEMILAMINECTOMY.

    Claim that defendant surgeon was negligent in that he had failed to take a proper and complete history from plaintiff before performing hemilaminectomy *held,* not substantiated where hospital records disclose defendant had set forth the history of plaintiff's case excepting a treatment for a back condition that was unimportant.

3. SAME—MALPRACTICE—HEMILAMINECTOMY—DIAGNOSIS.

    Procedure so far as tests to diagnose plaintiff's condition prior to performance of hemilaminectomy *held,* to have been proper.

4. SAME—POSSIBLE RESULTS OF OPERATION—ADVICE TO PATIENT OF POSSIBLE RESULTS.

    Whether an operating surgeon should advise the patient of all possible results of the proposed operation before performing it is to be determined  with reference to the general practice customarily followed by the profession in the locality.

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  41 Am Jur, Physicians and Surgeons § 129.
[2, 3]  41 Am Jur, Physicians and Surgeons §§ 92, 131.
[4, 5]  41 Am Jur, Physicians and Surgeons §§ 79, 87, 96.
[6]  41 Am Jur, Physicians and Surgeons §§ 92, 129, 131.
[7]  41 Am Jur, Physicians and Surgeons §§ 84, 96, 129.
[8]  41 Am Jur, Physicians and Surgeons §§ 128, 129.
[9]  41 Am Jur, Physicians nad Surgeons §§ 129, 131.
[10, 11]  41 Am Jur, Physicians and Surgeons § 98.
[12]  41 Am Jur, Physicians and Surgeons § 132.
[13]  41 Am Jur, Physicians and Surgeons §§ 125, 128.
[14]  41 Am Jur, Physicians and Surgeons § 132.
[15]  20 Am Jur 2d, Costs §§ 14–16.

5. SAME—MALPRACTICE—ADVICE TO PATIENT OF POSSIBLE RESULTS
   OF PROPOSED OPERATION.
   Defendant operating surgeon who diagnosed plaintiff's back
   condition as a ruptured disc and advised going to hospital
   for a myelogram to verify findings and an operation to correct
   the same was not guilty of negligence in failing to advise plain-
   tiff of reasonable expectations of risk and possibility of harm
   from the operation proposed, where there was no evidence as
   to standard of practice followed by practitioners in the com-
   munity on the matter of advising the patient so that he could
   make a reasonably informed choice.

6. SAME—MALPRACTICE—CHOICE OF PROCEDURES—EXPERT EVIDENCE—
   HEMILAMINECTOMY—CONSERVATIVE TREATMENT.
   Plaintiff's claim of negligence on part of defendant surgeon who
   performed a hemilaminectomy rather than first attempting
   conservative treatment *held*, not sustained by expert evidence
   adduced, where a choice of an operation was shown to be
   proper practice.

7. SAME—MALPRACTICE—HEMILAMINECTOMY—QUALIFIED SURGEON—
   EVIDENCE.
   Claim by patient that defendant, operating surgeon who had
   performed hemilaminectomy on plaintiff, had improperly and
   unskillfully performed an operation for which he was not quali-
   fied either by experience or training to do *held*, not substan-
   tiated by expert evidence as is required by the general rule to
   support such claim.

8. SAME—MALPRACTICE—INJURY TO HEALTHY PARTS OF THE BODY.
   An exception to the general rule requiring expert evidence to sup-
   port charge of malpractice has been adopted where healthy and
   undiseased parts of the body requiring no treatment are injured,
   during the professional relationship, under circumstances where
   negligence may legitimately be inferred, no emergency being
   present.

9. SAME — MALPRACTICE — HEMILAMINECTOMY — INJURY TO DURA —
   PROXIMATE CAUSE — EVIDENCE.
   Plaintiff who came with back trouble to defendant surgeon, was
   hospitalized for diagnostic tests and operation of hemilaminec-
   tomy followed by opening of the incision and drainage of
   spinal fluid made out a case of negligence on part of defendant
   by expert testimony that the dura could have been injured
   during the operation by defendant, as plaintiff was not required
   through evidence to eliminate all causes other than negligence
   in order to recover.

10. SAME—MALPRACTICE—HEMILAMINECTOMY—POST-OPERATIVE CARE.

Expert evidence presented in malpractice action against surgeon who performed hemilaminectomy on plaintiff's back *held*, not to substantiate plaintiff's claims of negligence in that defendant failed to properly close the operative wound, failed to close the wound in tiers with an adequate number of stitches considering the tissues in plaintiff's body, and that stitches were removed and plaintiff discharged before the operative wound had healed sufficiently.

11. SAME—MALPRACTICE—HEMILAMINECTOMY—REOPENING OF INCISION—EVIDENCE.

Defendant's failure and refusal to give plaintiff further attention after hemilaminectomy operation when advised that wound had opened and large quantities of fluid were being discharged and wrongfully assured plaintiff that such were to be expected *held*, properly for consideration of jury on issue of defendant's malpractice, where there was both lay and expert evidence that the condition was relieved by relatively simple treatment.

12. SAME—MALPRACTICE—QUESTIONS FOR JURY.

Claims of negligence advanced by plaintiff in action against surgeon for malpractice that were not supported by medical evidence should not have been submitted to jury but issues properly supported with recovery limited to injury or loss proximately caused thereby should have been submitted to jury.

13. SAME — MALPRACTICE — CHIROPRACTOR — HEMILAMINECTOMY — PROXIMATE CAUSE.

Trial judge in malpractice action against surgeon who performed hemilaminectomy on plaintiff after latter had been treated for about 2 weeks by a chiropractor *held*, properly to have required that plaintiff show by medical evidence that the then physical condition for which he claimed damages was caused by the alleged negligence of defendant.

14. SAME—MALPRACTICE — CROSS APPEAL — NEGLIGENCE — INSTRUCTIONS.

Cross appeal of defendant surgeon in action against him for malpractice is sustained for prejudicial error of jury instruction in submitting to jury plaintiff's unfounded claims of negligence.

15. COSTS—NEITHER PARTY PREVAILING.

No costs are allowed on appeal to Court of Appeals in malpractice action, where case is reversed on some of the grounds asserted, as neither party has prevailed.

Appeal from Muskegon; Beers (Henry L.), J. Submitted Division 3 February 2, 1965, at Grand Rapids. (Docket No. 245.) Decided October 18, 1965. Rehearing denied November 24, 1965. Leave to appeal denied by Supreme Court March 9, 1966. See 377 Mich 704.

Declaration by Jack Miles against William C. Van Gelder for injuries sustained by defendant's medical malpractice. Verdict for plaintiff. Judgment *non obstante veredicto* for defendant. Plaintiff appeals and defendant cross-appeals. Reversed and remanded for new trial.

*James A. Markle* and *George A. Parmenter,* for plaintiff.

*Moll, Desenberg, Purdy, Glover & Bayer,* for defendant.

HOLBROOK, P. J. This action was brought to recover damages for alleged malpractice by a physician, concerning treatment for a back injury, and from a judgment *non obstante veredicto* of no cause of action for defendant, plaintiff appeals, and defendant cross-appeals.[1]

Jack Miles, plaintiff, 27 years of age, suffered an injury to his back March 26, 1959, in lifting a box of picnic hams from the cooler at a supermarket where he worked in Muskegon. For about two weeks thereafter, he stopped work and was treated by a chiropractor. At the end of this period, without improvement, he attempted to go back to work on a part-time basis. Suffering severe pain, plaintiff called defendant Dr. William C. Van Gelder on April 14, 1959, who saw him shortly thereafter on the same day. After taking a history from the plain-

---

[1] GCR 1963, 812.8.

tiff, and giving him certain tests, defendant diagnosed the complaint as a ruptured disc, and advised going into the hospital for a myelogram to verify his findings and an operation to correct the condition.

Plaintiff was admitted to Mercy hospital, Muskegon, on April 16, 1959, and on the same day, signed an authorization for medical and surgical treatment. The next day a myelogram was performed upon his back which indicated a herniated disc on the left side between L-5 and S-1. Dr. Swenson, an orthopedist, was called in by defendant for consultation and examined the plaintiff and the myelogram. Dr. Swenson's report in the hospital record verifies the findings of defendant. On April 18, 1959, the defendant performed a hemilaminectomy between L-4, L-5, and S-1. The hospital report indicated that *a herniated disc was not found;* however, the nerve roots in and around L-4, L-5, and S-1 area showed some edema and some exudate. Exploration of nerve roots of S-1 and of L-5 were completely normal, and a probing above in the region of L-4 nerve root was also nonproductive. With a little difficulty, the nerve roots were freed. Bleeding was minimal, controlled by electric cautery with no difficulty. The plaintiff remained hospitalized without unusual occurrence for seven days. Friday, April 24, 1959, the stitches were removed and Saturday, April 25, 1959, the plaintiff was discharged. On the way home from the hospital it was noticed that plaintiff's shirt and pants were wet. After arriving home and going to bed, it was observed that the incision had begun to open with considerable discharge. Defendant was notified by telephone in the late afternoon of this fact, and defendant stated that there was nothing to worry about and to come to his office on Monday. The following day, on Sunday, the incision had completely opened and drain-

age was profuse. The plaintiff was in great pain and his wife called the defendant and informed him of the situation and her concern. She reported that the conversation was as follows:

"And all he could say to me, he asked me if I was a doctor, and I told him no, and he asked if I was a nurse, I said no. He says, 'Well, then, you don't know, do you?'"

The following day, Monday, plaintiff, suffering severe pain and very weak, went to the defendant's office. Upon examination, defendant had plaintiff removed to Mercy hospital by ambulance, and there his incision continued to drain spinal fluid for a period of 8 to 10 days. The plaintiff continued to experience severe headaches and pain, and Friday evening, May 1st, was considerably worse. Defendant was out of town and Dr. Emil Lauretti, a partner of the defendant, came in late that evening and examined plaintiff. He asked the nurse if plaintiff had wet the bed. The nurse replied no. Then Dr. Lauretti explained, "Have you been draining like this—how long have you been draining like this?" To this the plaintiff replied, "All week." The doctor uttered an oath indicating disgust, and ordered a skultetus binder placed around the patient and the foot of the bed elevated. The plaintiff's severe headache subsided, the incision closed, and plaintiff was discharged May 10, 1959.

Plaintiff continued to experience pain and difficulty with his back and in June, 1959, with defendant's consent, transferred to the care of Dr. John Folsom, an orthopedic surgeon. Dr. Folsom diagnosed plaintiff's complaint as "post operative nerve root irritation and neuropathy," decided that surgery was not at that time indicated, and started plaintiff on a conservative program to relieve his difficulty. Plaintiff's main complaint at that time

was tenderness in and about the incision with a dull ache in the back muscles along the spine. In November, 1959, plaintiff was admitted to Hackley hospital for intensive physiotherapy, bed rest, and conservative care. Dr. Folsom's diagnosis, according to the hospital record was:

"Nerve root compression syndrome, probably due to adhesions from spinal fluid fistula and previous surgery."

On December 9, 1959, Dr. Folsom operated on plaintiff's back in the area of previous surgery performed by defendant. Dr. Folsom described the operation in part as follows:

"A partial laminectomy of, from L, the 4th lumbar to the 1st sacral segment, neural arch to L-5 was done. A repair of a dural fistula was done, and a decompression of the left 5th lumbar and 1st sacral nerve root was done. * * * There was, what I described as a dural fistula, or a meningocele at the level of L-5, S-1, which was about the size of a frozen pea."

The following question was put to and answer given by Dr. Folsom, a medical witness:

"Q. Doctor, in this particular case, it appears, that the drainage of the spinal fluid started approximately one week or slightly more than one week after the original surgery. Would that indicate to you whether or not there was leakage from the dura at the time of the surgery, or when did that leakage start?"

"A. To some degree, yes; had it definitely been present at the time of surgery one would see, I would think some evidence of an undue amount of water-colored fluid or bloodtinged fluid of somewhat finer texture than ordinary blood, if a rent of any size had been put in the dural sac at that time. By the same token, there may be small rents that do

not leak until a later date, that are not evident at the time of mop-up after the operation has been done, and you are ready to effect your closure of the wound."

The plaintiff experienced no improvement in his general condition concerning his back as to pain and ability to work. He was further treated by Dr. Folsom for some time and in April, 1960, Dr. Folsom performed a back fusion operation. Plaintiff at the trial still complained of pain in his back.

The jury returned a verdict for plaintiff of $25,000. Trial court granted defendant's motion for judgment notwithstanding the verdict and entered judgment of no cause for action.

The trial judge in his opinion on the motion for judgment notwithstanding the verdict, stated in part as follows:

"The plaintiff bases his claim of having established negligence and malpractice on the part of the defendant, upon the testimony of Dr. Folsom, who testified as an expert. This expert's testimony, which I have carefully examined, indicates the diagnosis made by the defendant was in accord with customary and usual practice in this field; that the symptoms indicated the findings made by the defendant; he further testified that in a case of this kind there were alternative procedures that could have been followed, all of which would have conformed with the usual and customary practice of physicians, and that the choice of procedure to be followed was made in the sound judgment of the treating physician. He further testified that with his knowledge of the case, he having subsequently treated the plaintiff, and the findings made by another expert, namely Dr. Swenson, the findings of the defendant at the time he made his original diagnosis indicated the necessity of surgery immediately. This physician further testified as to the leakage of spinal fluid, which I have above mentioned. He

testified this leakage of spinal fluid could have been caused in a number of ways, either by surgery, or in a manner unrelated thereto. He further testified in his opinion, the present condition complained of by the plaintiff, is due to and is the same as the disability suffered previous to the time the plaintiff consulted the defendant. * * *

"There are two principal reasons which strongly compel the conclusion that I cannot allow the verdict in this case to stand. * * * I do not believe there was any evidence in this case upon which the jury could predicate a finding the doctor failed to bring to bear the usual and customary skill, knowledge and care of other physicians in this community, or that what he did was not in accordance with the usual and customary practice. * * *

"I can find no evidence that would establish the fact anything the doctor did is a present proximate cause of the disability this plaintiff has. In fact, the only testimony on that subject is that the plaintiff's condition is the same today as it was immediately following the injury to the back."

The general rule of law in cases of malpractice against a physician or surgeon is contained in 141 ALR 5, 6:

"The overwhelming weight of authority supports the view that, ordinarily at least, expert evidence is essential to support an action for malpractice against a physician or surgeon." Citing *Wood* v. *Barker* (1882), 49 Mich 295; *Farrell* v. *Haze* (1909), 157 Mich 374; *Miller* v. *Toles* (1914), 183 Mich 252 (LRA 1915C, 595); *Zoterell* v. *Repp* (1915), 187 Mich 319; *Delahunt* v. *Finton* (1928), 244 Mich 226.

To properly dispose of the issues before this Court, it is necessary to deal with plaintiff's 10 asserted claims of negligence of defendant, submitted by the trial judge to the jury for determination.

Plaintiff claims that defendant (1) failed to take a proper and complete history from plaintiff; (2)

failed to use reasonable or appropriate and necessary tests to diagnose his condition; (3) failed to advise plaintiff of the reasonable expectations of risk and possibility of harm from the procedures and operation proposed so that plaintiff was given no opportunity to make a reasonably informed choice. These may be considered together. A review of the hospital records discloses that prior to the myelogram and the operation, defendant sets forth the history of plaintiff's case. He recites all of the facts asserted by plaintiff excepting treatment in 1954 for a back condition which Dr. Folsom, testified was unimportant in determining necessity for the operation by defendant. The claims that defendant failed to use reasonable or appropriate and necessary tests to diagnose plaintiff's condition are without foundation. Dr. Swenson, the consultant, also conducted a series of tests similar to those that defendant conducted. This, coupled with the myelogram, according to the testimony of Dr. Folsom, was proper procedure. The assertion that defendant failed to advise plaintiff of the reasonable expectations of risk and possibility of harm from the procedures and operation proposed so that plaintiff was given no opportunity to make a reasonably informed choice, is subject to the general rule. In *Roberts* v. *Young* (1963), 369 Mich 133, 139 (99 ALR2d 1330), Mr. Justice CARR stated:

"Counsel for plaintiffs assert as a possible basis of liability the failure of defendant Young to advise Mrs. Roberts that infection might follow from an operation of the character that plaintiffs sought to have performed.  *  *  *  No claim is made that defendant Young had knowledge, or believed, that such would be the case. The question presented is in substance whether a physician and surgeon before operating should advise the patient of all *possible* results. Whether such should be done would

seem to be a matter to be determined with reference to the general practice customarily followed by the medical profession in the locality. *Twombly* v. *Leach,* 65 Mass 397; *Rosenberg* v. *Feigin,* 119 Cal App 2d 783 (260 P2d 143)."

Defendant did inform plaintiff of the type of operation he proposed. Plaintiff's father previously had two similar operations and plaintiff made inquiry concerning the same. There is a complete lack of medical evidence as to the standard of practice followed by practitioners in the community on advising a patient of reasonable expectations of risk and possibility of harm from the operation proposed.

Plaintiff claims (4) that defendant prescribed and performed an operation for a suspected ruptured disc without first attempting conservative treatment. Defendant and Dr. Swenson found plaintiff to have atrophy of muscles, reflex changes, and sensory changes, which could become permanent unless corrected. The medical expert, Dr. Folsom, agreed that a decision had to be made and the choice of an operation under these circumstances would be proper practice. For plaintiff to maintain this claim of negligence, he must show it by expert evidence which he has failed to do. *Delahunt* v. *Finton* (1928), 244 Mich 226.

Plaintiff claims (5) that defendant improperly and unskillfully performed an operation, which he was not qualified either by experience or training to do, is also governed by the general rule, requiring expert evidence. The record discloses no such evidence.

Plaintiff claims (6) that in performing said operation, defendant cut into and through the dura matter or otherwise bruised the same which he should not have done, and having done so, he failed to ob-

serve or recognize that he had done so. Was there sufficient evidence present to submit this alleged negligence to the jury? Dr. Folsom testified:

"Well, one, the spinal fluid, the Lord put it there, it's supposed to be there, not to be let out to some place other than the system where it normally is."

His statement is not refuted by other evidence. There is no claim by defendant that the dura would need to be cut or nicked or bruised in an operation such as he proposed, and performed. The jury would under these facts, be at liberty to find that defendant cut or bruised the dura and find negligence from the circumstances surrounding the transaction and the resulting condition of the patient, both expert and lay. In the recent case of *Higdon* v. *Carlebach* (1957), 348 Mich 363, we find a thorough treatment of the law concerning the exception to the general rule requiring expert evidence in an action of malpractice. In that case plaintiff sought the treatment of her teeth by defendants, each a practicing dentist. One of the defendants in working upon her teeth used an electrically-driven disk. During the treatment the disk cut the plaintiff's tongue, resulting in severe pain. She was taken to the hospital where her tongue was sutured. Two landmark cases were therein discussed: *Vale* v. *Noe,* 172 Wis 421 (179 NW 572), wherein recovery was denied upon the premise that it fell within the general rule; and *Ellering* v. *Gross,* 189 Minn 68 (248 NW 330), wherein recovery was sustained under legally identical circumstances. Mr. Justice BLACK on p 374 stated in part as follows:

"*Ellering* proceeds on strength of prevailing authority holding that, in cases of instant nature, direct proof unsupported by expert opinions is sufficient, if believed by the trier or triers of fact, to warrant an inference of negligence. * * * The

exception so adopted will apply to cases where healthy and undiseased parts of the body requiring no treatment are injured, during the professional relationship, under circumstances where negligence may legitimately be inferred, as in these Higdon cases."

In *Lince* v. *Monson* (1961), 363 Mich 135, the general rule and the exception concerning liability of a physician or surgeon is discussed. On p 142 Mr. Justice DETHMERS stated in part as follows:

"Plaintiff's theory seems to be that because there is testimony that the ureter is not the subject matter of operations for the maladies defendants were seeking to correct and that they had not intended to suture or involve the ureter, therefore, it would be within the common knowledge of laymen, without the benefit of expert medical testimony, that the actual involving of the ureter by suture was negligence. The question here, however, is not that simple. *Purpose of the operation and intent of the surgeon, alone, are not conclusive here.* The question, rather, is whether the action of defendants, *confronted with the endometriosis and hemorrhaging condition, obliterated landmarks and need for quick stopping of bleeding by placing stitches deep into the endometriosis mass,* conformed to standards of good practice in the community. Common knowledge and the experience of ordinary laymen do not equip them to give the answer without the aid of expert medical testimony." (Emphasis supplied.)

Judgment notwithstanding the verdict in favor of defendants was affirmed because in the conduct of the operation, the surgeons were confronted with an emergency situation. We have no evidence of an emergency arising in the course of the operation in the case at hand. The expert evidence was to the effect that it was improper to cut or nick the dural sac. According to expert evidence the bursting of

the dural sac could have been caused by cutting or nicking the same by defendant in the operation procedure. These facts together with lay evidence of the circumstances surrounding the transaction permitted legitimate inferences therefrom to be drawn by the triers of the facts. See *Loveland* v. *Nelson* (1926), 235 Mich 623. Plaintiff is not required through evidence to eliminate all causes other than negligence, in order to recover. In *Harrison* v. *Lorenz* (1942), 303 Mich 382, on p 392, Mr. Justice CHANDLER stated in part as follows:

"Plaintiff presented a theory under which the jury, if they believed the testimony, could have found defendants guilty of negligence. He was not required to exclude all other possible causes of the explosion."

Plaintiff further claims (7) that defendant failed to properly close the operative wound; (8) that defendant failed to close the wound in tiers with an adequate number of stitches considering the tissues of plaintiff's body; and (9) that defendant removed the stitches and discharged plaintiff from the hospital before the operative wound had healed sufficiently, are governed by the general rule requiring expert evidence. There is no such evidence.

Plaintiff finally claims (10) that defendant failed and refused to give plaintiff further attention when he was advised that the wound had opened and that large quantities of fluid were being discharged and wrongfully assured plaintiff that this was to be expected, raises an issue that may be determined by a jury with lay evidence together with a legitimate inference drawn from evidence of simple medical treatment which caused the condition to be corrected. See *Bradshaw* v. *Wilson* (1950), 87 Ohio App 319 (94 NE 2d 706); *Richeson* v. *Roebber* (1941), 349 Mo 132 (159 SW 2d 658, 141 ALR 1); *Shives* v. *Chamberlain* (1942), 168 Or 676 (126 P2d 28); *Cov-*

*ington* v. *James* (1938), 214 NC 71 (197 SE 701). Dr. Van Gelder was called both Saturday, April 25th, and Sunday, April 26th, concerning the opening of the wound, the profuse drainage, and attendant severe pain and headache. Plaintiff testified that no treatment or attention was given by defendant in response to these calls, except his hospitalization, Monday, April 27th, until Friday, May 1st, when Dr. Lauretti, had the foot of the bed raised and a skultetus binder applied, *relieving the plaintiff of the pain and severe headaches and causing the wound to heal.* Dr. Lauretti also testified explaining his treatment to effect relief of plaintiff's headache.

Only the claimed negligence of defendant as set forth in assertions (6) and (10) should have been submitted to the jury,[2] *with recovery limited to injury or loss proximately caused by such claimed negligence of defendant.* The medical evidence required to substantiate plaintiff's other asserted claims of negligence was lacking and under defendant's requests to charge should not have been submitted to the jury.

The trial judge was correct in his determination that plaintiff must show by medical evidence that the then physical condition for which he claimed damages was caused by the alleged negligence of defendant. *Lince* v. *Monson, supra.*

Reversed. Judgment *non obstante veredicto* is set aside. The cross appeal is sustained for prejudicial error of jury instruction, that is, submitting to jury plaintiff's unfounded claims of negligence.

Remanded for new trial in accord with this opinion. Neither party prevailing, no costs.

FITZGERALD and J. H. GILLIS, JJ., concurred.

---

[2] See *Litvin* v. *Joyce* (1950), 329 Mich 56; *Susich* v. *Michigan Consolidated Gas Co.* (1940), 292 Mich 612,