**Diane M. KOCH, Special Administratrix of the Estate of Curtis J. Koch, Deceased, Plaintiff-Appellant,**

v.

**A. C. GORRILLA, M. D., and M. A. Gertz, M. D., Defendants-Appellees.**

**No. 75–2301.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1977.

Decided April 15, 1977.

(D.Mich.1968), but this case does not indicate that the *Childress* standards are inapplicable.

Wisti & Jaaskelainen, Hancock, Mich., for plaintiff-appellant.

Charles Humphrey, Jr., Humphrey & Weis, Ironwood, Mich., for defendants-appellees.

Arthur A. Neiman, Escanaba, Mich., for Santini.

John D. Peacock, Sault Ste. Marie, Mich., for Gertz.

Before CELEBREZZE and PECK, Circuit Judges, and FEIKENS,* District Judge.

FEIKENS, District Judge.

This appeal concerns an action in diversity, brought by plaintiff-appellant Diane M. Koch against defendants, A. C. Gorrilla, M.D., Florien J. Santini, M.D., M. A. Gertz, M.D., and Grand View Memorial Hospital, all of Ironwood, Michigan, for medical malpractice upon and wrongful death of plaintiff's husband, Curtis J. Koch. The case was tried to a jury. Plaintiff appeals from a directed verdict of no cause of action in favor of the defendants entered at the close of her proofs. She contends that the District Court improperly excluded certain testimony of decedent's treating physicians of Duluth, Minnesota relating to the standards of medical practice applicable to defendants as general physicians. Appellant also contends that the District Court erred in refusing to submit her case to the jury despite expert testimony from defendants themselves describing the standards of medical practice in Ironwood, Michigan, where the claimed torts occurred, and evidence tending to show a breach of those standards. Michigan law controls our determination of these issues.

Curtis Koch traveled to Ironwood, Michigan on Tuesday, May 19, 1970, with his wife and three children on a trip for business and pleasure. In the evening of Wednesday, Koch complained of nausea and abdominal pains which he attributed to a barbecue he had eaten that afternoon for lunch. He vomited that night and was nauseous and weak throughout the next day, Thursday. His abdominal pains and vomiting continued through Thursday night, and in the early afternoon of Friday, May 22, 1970, Koch went for treatment to Dr. A. C. Gorrilla, a general practitioner in Ironwood.

---

* Honorable John Feikens, United States District Judge for the Eastern District of Michigan, sitting by designation.

Dr. Gorrilla questioned and physically examined Koch and tentatively diagnosed his ailment as an inflammation of the inner walls of the stomach, caused by eating tainted food. Dr. Gorrilla's records relating to his examination of Koch were unavailable at trial, but he testified from memory that Koch had given a history of having eaten a hamburger late Thursday evening and that he had taken Koch's temperature and blood pressure and performed a urinalysis. Dr. Gorrilla did not rule out acute appendicitis, but he prescribed an enema and the application of a wet heat pack to Koch's upper abdomen. Koch was to call Dr. Gorrilla's office if this treatment did not alleviate his symptoms within several hours; he was told that hospitalization would in that event be necessary.

Koch returned home and took an enema, but his condition continued to worsen. After Mrs. Koch made an unsuccessful attempt to reach Dr. Gorrilla Saturday evening, she called the Grand View Memorial Hospital near Ironwood on Sunday morning and was told by Dr. Gertz to bring Koch to the hospital. There, Koch was examined by Dr. Gertz and hospitalized immediately. He was very ill. The initial diagnosis after X-ray examination was an acute intestinal obstruction due to a ruptured appendix. After consultation with Dr. Santini, Dr. Gertz determined that Koch was too ill to undergo immediate surgery for the removal of his appendix, and he thereupon prescribed a conservative course of treatment for the purpose of improving Koch's condition so as to permit surgery.

Koch remained at the Grand View Hospital for seven days, until May 31, 1970. During this time, Koch's white blood count was monitored and showed an increase from 12,100 upon admission to 21,000 at the time of his discharge. Koch was X-rayed once for obstruction of his intestinal tract. Two enemas were given for treatment purposes. Dr. Gertz also ordered a Levine tube inserted into Koch's stomach to further monitor his condition.

Koch was taken from Grand View Hospital and transferred to St. Mary's Hospital in Duluth, Minnesota on Sunday, May 31. He underwent surgery the following day. Dr. Monge, who performed the operation, testified that he encountered large amounts of pus upon opening the peritoneal cavity. The appendix had ruptured and infected the entire peritoneal cavity, the pelvis and upper abdomen. The small intestine was dilated, abscessed, and due to fibronous adhesions was kinked. There were already signs of liver dysfunction and jaundice. Dr. Monge removed the appendix and irrigated the peritoneal cavity. Koch survived the surgery but his condition did not improve; liver and renal failure followed. He died on June 12, 1970.

At trial, plaintiff's presentation began with the reading of the deposition testimony of Dr. Monge, the decedent's treating physician in Duluth. In it he described Koch's general condition upon admission to St. Mary's Hospital in Duluth, the course of his surgery, and his subsequent complications and demise. Plaintiff next presented the deposition testimony of Dr. Aufderheide, who performed an autopsy of the decedent and reported the cause of death as a ruptured appendix resulting in an infection of the abdomen and other complications. Then followed the testimony of Drs. Gorrilla, Santini, and Gertz, who were examined regarding their treatment of Koch and the standards of medical practice generally recognized in the Ironwood area. Finally, Mrs. Koch testified to the events surrounding her husband's illness and the course of his medical treatment.

At the close of plaintiff's case, the District Court upon motion directed a verdict of no cause of action in favor of defendants and ruled that plaintiff had failed to present any direct expert testimony to establish that defendants had breached their duty of professional care, as that duty is recognized in defendants' community or similar communities. The District Court held that such evidence is required under Michigan law to sustain a medical malpractice action, citing *Siirila v. Barrios,* 58 Mich.App. 721, 228 N.W.2d 801 (1975), and

*Lince v. Monson,* 363 Mich. 135, 108 N.W.2d 845 (1961), among other authorities.

Appellant first challenges a ruling made by the District Court excluding certain testimony of decedent's treating physicians of Duluth, Drs. Monge and Aufderheide, relating to the propriety of care offered decedent by the defendant doctors in Ironwood, Michigan. Our consideration of this issue is hampered at the outset by the absence of any such ruling in the record. The briefs of all parties state that the District Court issued this ruling from the bench during the course of trial, but appellant's counsel was frank to admit at oral argument that the transcript of the trial proceedings contains no mention of it. However, even assuming that some such testimony was offered by appellant and excluded by the court as inadmissible under Michigan law, we perceive no error in the District Court's ruling.

▮ The standard of medical practice which governs a general practitioner's professional conduct under Michigan law is that degree of skill and diligence ordinarily exercised by general practitioners in the same or similar localities, with due consideration to the state of the medical arts at the time. *Lince v. Monson, supra; Sampson v. Veenboer,* 252 Mich. 660, 234 N.W. 170 (1931); *Abbe v. Women's Hospital Assoc.,* 35 Mich.App. 429, 192 N.W.2d 691 (1971). Accordingly, decedent's treating physicians from Duluth would only have qualified as experts on the standards of practice owed by defendants in this case if they could have testified to a knowledge of the standards of practice of general practitioners in the Ironwood area or in similar communities. *Sampson v. Veenboer, supra; Skeffington v. Bradley,* 366 Mich. 552, 115 N.W.2d 303 (1962). A careful review of the record indicates, however, that Drs. Monge and Aufderheide were only familiar with and prepared to testify to the standards of medical practice in the Duluth area. There is nothing in the record to indicate that decedent's treating physicians from Duluth had any knowledge of medical standards prevailing in the Ironwood community.

Nor is it possible to consider Duluth a part of the Ironwood community to bring it within the Michigan rule. While Duluth is the closest large city to Ironwood at a distance of 100 miles, and while there may be referrals from Ironwood to Duluth medical facilities on a regular basis, Ironwood remains a much smaller community, with its own separate identity and its own localized medical needs and services. Contrast *Morgan v. Engles,* 372 Mich. 514, 127 N.W.2d 382 (1964), cited by appellant. Duluth and Ironwood are not part of the same medical community, nor are they similar medical communities; *McPhee v. Bay City Samaritan Hospital,* 10 Mich.App. 567, 159 N.W.2d 880 (1968); *Skeffington v. Bradley, supra*; and therefore any testimony from appellant's treating physicians from Duluth regarding Duluth's standard of practice was properly excluded by the District Court as irrelevant.

▮ Appellant has raised several policy arguments for the abolition of Michigan's locality rule as applied to general practitioners, but a federal appellate court sitting in a diversity action has no power to question the wisdom or utility of this doctrine. Recently,[1] the Michigan Supreme Court decided the case of *Siirila v. Barrios,* 398 Mich. 576, 248 N.W.2d 171 (1976), a medical malpractice action very much similar to the instant case, in which plaintiff sought to overturn the Michigan locality rule on the same policy grounds urged here. Four of the seven justices held that the issue had not been preserved for appeal and affirmed a verdict for defendants on this basis, although two justices of this majority discussed the locality rule in a separate opinion and recommended that the Michigan standard be further qualified to make local community factors only relevant and not controlling. Three other justices concurred in the result, arguing that the Michigan doctrine has continuing vitality and should be retained. In light of this decision, we cannot say that the Michigan Supreme Court would overturn this doctrine were it

1. December 21, 1976.

faced with the appeal now before us, and accordingly, we are bound by Michigan precedent. *Lester v. Aetna Life Insurance Co.,* 433 F.2d 884, 888 (5th Cir. 1970); *Mason v. American Emery Wheel Works,* 241 F.2d 906 (1st Cir. 1957).

Appellant's second claim challenges the directed verdict in favor of defendants Drs. Gorrilla and Gertz. Appellant does not challenge the granting of a directed verdict as to defendants Dr. Santini or Grand View Memorial Hospital. She contends that the District Court erred in ruling that expert opinion evidence as to a breach of applicable medical standards of practice is required under Michigan law before a *prima facie* case of malpractice is made out. It is her position that a jury question as to liability was presented by expert testimony from the defendants themselves as to the standards of medical care in Ironwood, Michigan and by evidence tending to show a breach of those standards, citing *DeGroot v. Winter,* 261 Mich. 660, 247 N.W. 69 (1933); *Harvey v. Silber,* 300 Mich. 510, 2 N.W.2d 483 (1942); *Morgan v. Engles, supra.*

[4] We cannot agree. The District Court correctly ruled that Michigan law requires plaintiff in a malpractice action to present expert testimony both as to the standards of medical practice and as to the breach of those standards by the defendants. *Skeffington v. Bradley, supra; Wrobel v. Cotman,* 372 Mich. 383, 126 N.W.2d 723 (1964); *Brandon v. Art Centre Hospital,* 366 F.2d 369 (6th Cir. 1966). This doctrine and the policy reasons which support it were discussed at length in *Lince v. Monson, supra,* 363 Mich. pp. 139–140, 108 N.W.2d pp. 847–848:

> In the ordinary negligence case a question is presented whether an ordinary, careful and prudent person would have done as defendant did under the circumstances. Presumably a jury of 12 persons, drawn from and representing a cross section of the community, is competent to judge that question, on the basis of its own knowledge and experience, and to determine negligence or freedom therefrom accordingly. Sometimes, in

such cases, a problem presented is whether the question of defendant's negligence is one of fact for the jury or of law to be decided by the court. That is not the problem here. Rather, it must be determined in this case whether it is competent for a jury of laymen to decide a question concerning professional practice and to make a finding of malpractice without benefit of professional testimony to support it. In a case involving professional service the ordinary layman is not equipped by common knowledge and experience to judge of the skill and competence of that service and determine whether it squares with the standard of such professional practice in the community. For that, the aid of expert testimony from those learned in the profession involved is required. As this Court said in *Zoterell v. Repp,* 187 Mich. 319, 330, 153 N.W. 692, 696:

> "As to those matters of special knowledge strictly involving professional skill and attention, unskillfulness, negligence, or failure to do that which ought to be done must be shown by the testimony of those learned in such matters."

The only exceptions to this doctrine, as the District Court properly held, are cases where the lack of professional care is so manifest or egregious that a layman could determine the issue of negligence by resort to common knowledge and experience. *Lince v. Monson, supra,* p. 141, 108 N.W.2d 845; *Roberts v. Young,* 369 Mich. 133, 138, 119 N.W.2d 627 (1963); *Murphy v. Sobel,* 66 Mich.App. 122, 124, 238 N.W.2d 547 (1975); *Burton v. Smith,* 34 Mich.App. 270, 272, 191 N.W.2d 77 (1971); *Haase v. DePree,* 3 Mich. App. 337, 346, 142 N.W.2d 486 (1966). Thus, a jury question as to malpractice has been made out without the aid of expert medical testimony where an instrument was left inside the patient after surgery; *Taylor v. Milton,* 353 Mich. 421, 92 N.W.2d 57 (1958); *LeFaive v. Asselin,* 262 Mich. 443, 247 N.W. 911 (1933); *Winchester v. Chabut,* 321 Mich. 114, 32 N.W.2d 358 (1948); where defendant dentist injected lysol into the patient's

gums, mistaking it for anaesthetic, *Loveland v. Nelson,* 235 Mich. 623, 209 N.W. 835 (1926); where the patient suffered severe lacerations from a cutting wheel during removal of a leg cast, *Howard v. Park,* 37 Mich.App. 496, 195 N.W.2d 39 (1972); where the patient suffered severe burns due to X-ray over-exposure; *Barnes v. Mitchell,* 341 Mich. 7, 67 N.W.2d 208 (1954); *Ballance v. Dunnington,* 241 Mich. 383, 217 N.W. 329 (1928); and where a defendant dentist drilled on a patient's tongue; *Higdon v. Carlebach,* 348 Mich. 363, 83 N.W.2d 296 (1957).

Holdings that expert testimony was not prerequisite to recovery in those cases were predicated on the proposition that it would be within common knowledge and the experience of lay jurors whether the acts in question were careless and not in accord with standards of good practice in the community.

*Lince v. Monson, supra,* 363 Mich. p. 142, 108 N.W.2d p. 848.

We do not believe that the factual situation presented in the instant case falls within this narrow exception to Michigan's general rule. Appellant argued at trial that expert medical testimony as to breach of the standards of practice is not necessary to prove her cause of action because any layman would recognize the seriousness and possible consequences of improper treatment of appendicitis. We fully concur in the District Court's response to this argument:

The Court will say, however, that the issue here is not whether a layman realizes the seriousness of appendicitis, the issue here is whether a layman could diagnose appendicitis and could recognize the proper diagnosis and/or treatment of the same without the aid of an expert witness.

The District Court found that expert medical testimony was needed as to this question, and we believe the court's ruling is substantially supported both by the record and by controlling Michigan precedent.

Dr. Gorrilla testified in substance that the symptoms and history related by decedent during his initial examination did not clearly indicate appendicitis or permit him to rule out other causes, such as food poisoning or an ulcer. He testified that he had not completed his examination and diagnosis of Koch at the time Koch left his office, that Koch was to report back to him within several hours if the prescribed enema and heat pack did not alleviate his symptoms, and that further tests and hospitalization would then be required.

Dr. Gorrilla tacitly admitted the potential danger in prescribing an enema and heat pack for a patient with a possible appendicitis, but he stated that the decision to pursue this course of treatment had to be made by the treating physician, in light of the particular circumstances of the individual case. Dr. Gorrilla also conceded that a white blood count would have been a useful test in diagnosing Koch's appendicitis, but he stated that he had had no opportunity to perform this test on Koch, since Koch never returned after his initial examination. Both Drs. Gorrilla and Gertz testified that Dr. Gorrilla's treatment of Koch conformed to accepted medical standards in the Ironwood area.

In light of this testimony, it cannot be said that the evidence of Dr. Gorrilla's negligence was so complete and convincing as to permit the jury to find malpractice without the aid of expert testimony. Plaintiff produced no other evidence tending to show that Dr. Gorrilla was obviously or palpably at fault in his treatment of decedent, or to establish that his treatment was not in accord with accepted medical standards in the Ironwood area.

Drs. Gertz and Santini testified that a patient with an already ruptured appendix need not undergo surgery immediately and that where the patient's condition is poor, conservative treatment is the more proper course. Dr. Gorrilla concurred, stating that the decision to treat conservatively or to operate in such a case depends upon a number of factors, including whether the patient is in shock, whether his fluid balances are sufficient for surgery, and whether his heart, kidneys and other vital organs are

functioning properly. All three doctors admitted the dangers inherent in not excising a ruptured appendix, but all agreed that the course of treatment in such a case is a matter for the sound discretion of the treating physician. All agreed that Drs. Gertz and Santini had not violated the recognized medical standards in the Ironwood area in concluding that conservative treatment was the appropriate course in decedent's case.

Drs. Gertz and Santini were examined extensively on the adequacy of their conservative treatment of Koch. Both doctors admitted the potential danger in prescribing enemas to a patient in Koch's condition but stated that this procedure also had therapeutic value in alleviating his intestinal obstruction. Dr. Gertz conceded that Koch's increase in white blood count during his stay in Grand View Memorial Hospital could have had medical significance in indicating an increase in infection and toxicity in decedent's system. However, Dr. Gertz offered an alternative explanation for such an increase, stating that a rise in the white blood count could also indicate a satisfactory immunological response to infection. Both Dr. Gertz and Dr. Santini testified that the decision to monitor stomach fluids with a Levine tube is a matter for the treating physician's judgment, and both discounted the importance of the change in stomach fluids shown in Koch's case.

On the basis of such testimony, the issue of Dr. Gertz's negligence does not appear simple or obvious. Whether decedent's course of treatment was properly carried out or whether the initial decision to treat conservatively was a proper one were not, in the District Court's view, questions which a jury could answer solely by resort of their own knowledge and experience.

Michigan courts have been very reluctant to extend the doctrine of *res ipsa loquitur* or inferred negligence to the field of medical malpractice. Aside from cases of X—ray burn, cases of instruments left in the patient after surgery, and the other cases of obvious misfeasance cited above, there are virtually no other Michigan decisions in which expert medical testimony on the issue of malpractice was deemed unnecessary to establish a *prima facie* case. In *Lince v. Monson, supra,* the defendant doctor, in an operation for removal of a cystic ovary, had inadvertently sutured the patient's ureter in attempting to stop a severe hemorrhage that had developed during the course of surgery. Plaintiff's attempt to prove negligence without the aid of expert medical testimony was rejected:

> Plaintiff's theory seems to be that because there is testimony that the ureter is not the subject matter of operations for the maladies defendants were seeking to correct and that they had not intended to suture or involve the ureter, therefore, it would be within the common knowledge of laymen, without the benefit of expert medical testimony that the actual involving of the ureter by suture was negligence. The question here, however, is not that simple. Purpose of the operation and intent of the surgeon, alone, are not conclusive here. The question, rather, is whether the action of defendants, confronted with the endometriosis and hemorrhaging condition, obliterated landmarks and need for quick stopping of bleeding by placing stitches deep into the endometriosis mass, conformed to standards of good practice in the community. Common knowledge and the experience of ordinary laymen do not equip them to give the answer without the aid of expert medical testimony.

*Lince v. Monson, supra,* 363 Mich. p. 142, 108 N.W.2d p. 849.

In *Rytkonen v. Lojacono,* 269 Mich. 270, 257 N.W. 703 (1934), a drainage tube was allowed to slip into the patient's pleural cavity due to defendant doctor's failure to secure the tube with a pin or with tape. Plaintiff's expert witness testified that other physicians in the area generally did secure drainage tubes with a pin. Even this testimony was deemed insufficient to make out a *prima facie* case:

> It would be rather natural for a jury to incline toward condemning the method used by defendant because of the fact

that the tube slipped (*res ipsa loquitur*), and also because the safety pin method appeals to the layman as mechanically safer. Such inclination makes it especially necessary that the issue be kept clear and not confused. Defendant's liability does not rest upon the methods actually used by other doctors of the vicinity or elsewhere but upon what is recognized by them as good practice. Where there is an opportunity for choice, the doctor is not guilty of negligence in using a method so recognized even though all his local contemporaries may employ another method.

*Rytkonen v. Lojacono, supra,* p. 275, 257 N.W. p. 705.

Similar attempts to establish malpractice without expert medical testimony on the issue of negligence were rejected in *Wrobel v. Cotman, supra,* where plaintiff's dentist had extracted a tooth without first taking X–rays; in *Mitz v. Stern,* 27 Mich.App. 459, 183 N.W.2d 608 (1970), where defendant surgeon had inadvertently cut the external sphincter muscle during a transurethral prostatectomy; and in *Miles v. Van Gelder,* 1 Mich.App. 522, 137 N.W.2d 292 (1965), where plaintiff alleged that the suturing of her surgical wounds was incompletely performed and prematurely removed.

In *Daniel v. McNamara,* 10 Mich.App. 299, 159 N.W.2d 339 (1968), the Michigan Court of Appeals, after an extensive survey of this field, characterized the current Michigan rule by concluding that the requirement of expert medical testimony may only be suspended where non-treated parts of the body are inadvertently injured during the course of treatment or where some other negligence on the physician's part, disassociated from the medical treatment proper, causes injury. See also, *Higdon v. Carlebach, supra,* 348 Mich. p. 374, 83 N.W.2d 296.

The rule appears broader on its face than it truly is in practice, for once medical judgment enters the picture the matter can no longer be said to be within common knowledge.

*Daniel v. McNamara, supra,* 10 Mich.App. p. 308, 159 N.W.2d p. 344. In that case, plaintiff had brought a malpractice action for injuries sustained to the heel of her foot, which had become ulcerated due to the improper application of a leg cast which had been taken off and then reapplied too tightly. The court there refused to apply the doctrine of *res ipsa loquitur*:

This is not a situation where the treatment was extraneous to the portion of the body injured, and consequently the injury standing alone is insufficient to go to the jury in the absence of evidence of improper or negligent performance (by community standards) on the part of Dr. McNamara. Likewise, the propriety of Dr. McNamara's reactions to plaintiff's complaints of pain and his subsequent actions are squarely within the realm of medical judgment and require some medical expertise to show that defendant's judgment was negligent. In short, as the trial court concluded, to allow the injury alone to go to the jury only begs speculation as to causation and negligence on the part of the defendant.

*Daniel v. McNamara, supra,* p. 310, 159 N.W.2d p. 345.

In light of these precedents, we conclude that the District Court was correct in holding that the issues of malpractice raised in the instant case were too complex to be entrusted to the jury's consideration without the benefit of medical testimony establishing negligence on the part of defendants. Under controlling Michigan authority, we conclude that the District Court was required to direct a verdict of no cause of action for defendants in the absence of proof that defendants had acted negligently in their treatment of plaintiff's deceased. The judgment of the District Court is affirmed.