HIGDON *v.* CARLEBACH.

1. APPEAL AND ERROR—DIRECTED VERDICTS—EVIDENCE.
   Plaintiff's testimony in a malpractice case is initially viewed and accepted when appraising defendant dentists' motion for instructed verdicts.

2. PHYSICIANS AND SURGEONS — MALPRACTICE — NEGLIGENCE — EVIDENCE.
   Direct proof of a dentist's negligence, unsupported by expert opinions, is sufficient, if believed by the trier of the facts, to warrant an inference of negligence in malpractice cases, at least where healthy and undiseased parts of the body requiring no treatment are injured during the professional relationship, under circumstances where negligence may legitimately be inferred.

3. SAME—DENTIST—NEGLIGENCE—EVIDENCE—INJURY TO TONGUE—RES IPSA LOQUITUR—EQUALLY DIVIDED COURT.
   Testimony of plaintiff patient, a high-school student, that while defendant dentist had been working on her teeth in the lower jaw with a separator disk on the drill, the drill went

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error § 886.
[2] 41 Am Jur, Physicians and Surgeons §§ 88, 129.

off her teeth on to her tongue "seemed to be and was there for a second or so before he took it out" and that she had not moved her tongue or head as the dentist was using the separator disk *held,* sufficient to base jury's finding of negligence of defendant; the Supreme Court being equally divided as to whether the rule of *res ipsa loquitur* should be applied.

Appeal from Wayne; Pugsley (Earl C.), J., presiding. Submitted January 15, 1957. (Docket Nos. 73, 74, Calendar Nos. 47,074, 47,075.) Decided May 17, 1957.

Case by Dolores R. Higdon against Joseph Carlebach and Brian Battersby, dentists, for malpractice. Similar action by Sandra Higdon, a minor, by Dolores R. Higdon, guardian. Cases consolidated for trial and appeal. Judgments for defendants notwithstanding verdicts. Plaintiffs appeal. Reversed and remanded for entry of judgments in accordance with the verdicts.

*Joseph Marvaso,* for plaintiffs.

*Moll, Desenberg, Purdy & Glover,* for defendants.

BLACK, J. These are consolidated actions for negligence occurring, as alleged, in the course of dental treatment. One is brought by plaintiff Sandra R. Higdon in her own right. The other, derivative from the first, is brought by Sandra's mother.

Sandra's cause is a striking duplicate of *Vale* v. *Noe,* 172 Wis 421 (179 NW 572); and *Ellering* v. *Gross,* 189 Minn 68 (248 NW 330). *Vale* denies recovery. The reasoning thereof shores defense argument that these actions cannot be maintained absent expert testimony tending, aside from the facts as shown, to establish Sandra's cause. *Ellering* sustains recovery in legally-identical circumstances. Sandra's cause depends in essence on validity of

doctrines therein approved. Our choice, consistent with Michigan law, must be made.

In the regular course of professional relationship Sandra, a high-school student, sought treatment of her teeth by the defendants, each being a practicing dentist. Her theory of recovery against defendant Carlebach is disclosed in paragraph 3 of her declaration, quoted at margin.* Immediately before Sandra's injury was sustained Dr. Battersby was engaged in working upon Sandra's teeth by means of an ultra-thin electrically-driven disk. The disk turned clockwise on its shaft and was 5/8 of an inch in diameter. Since our task is exclusively confined to appraisal of defendants' motion for instructed verdicts, we initially consider Sandra's version of occurrences giving rise to her alleged cause. She testified:

"I was holding on the chair with my both hands as now. My head was tilted back more than now. The doctor was on my right side. He used the drill for a short time, then he stopped and put the separator disk on the drill. He was then at my right shoulder, facing me. He was working on the lower teeth on the left side. As he was working with this separator disk, his left hand came from the back of my head around the side, and he was holding my jaw, my cheek with his middle finger. My mouth was as wide open as I could get, because he asked me to. My head was resting on the 2 round things that hold your head up and are attached to the chair itself. My feet were crossed. I was not given any instruc-

* "3. That on the date aforesaid, while defendants were so practicing and exercising such profession, they were retained and employed on behalf of plaintiff, for a certain reward, to treat the condition of teeth which existed in plaintiff's mouth on that date. Then and there defendant, Brian Battersby, was the agent, employee, partner, and/or associate of defendant, Joseph Carlebach, and said defendant, Brian Battersby, at all times herein mentioned, performed services as such representative of Joseph Carlebach, for the benefit, profit and reward accruing to Joseph Carlebach through the retention and employment on behalf of plaintiff."

tions by the doctor as to how I should remain, or as to moving.

"*Q.* Now, we are at the place where he is beginning to use the separator disk and my question is did he begin to use that?

"*A.* Yes.

"*Q.* All right. Now, tell us in point of seconds— I want you to think about this—to the best of your recollection how long from the beginning of the use of the separator disk until the incident happened, how many seconds was it or minutes?

"*A.* It was about a minute or so.

"*Q.* Sandra, I want you to face the jury and in your own words tell them what happened.

"*A.* He was drilling on my tooth for just a short time, and then, all at once, the drill just went off my teeth on to my tongue and it didn't seem like he took it out right away. It seemed to be there for a second or so before he took it out. And, then, he went around and shut it off. Then he took it out and told me just to sit still. And, he went out into the office. \* \* \*

"I then began to bleed in my mouth. Dr. Battersby told me I would be all right. He said he had just cut my tongue a little bit. I was administered a shot in the arm. Another doctor then came and they started to suture my tongue. There was an awful lot of pain. Later I was taken to another doctor downstairs. And still later Dr. Battersby took me to Wyandotte General Hospital.

"I stayed in the hospital more than 2 weeks altogether. During my stay I was very sick indeed. I received treatment by special nurses and medical specialists. For days my tongue was so swollen I could only drink with a tube. Whereas I weighed 118–120 before the accident, I now weigh 95 pounds. My tongue now has a feeling of no feeling or numbness. I don't seem to have any appetite."

Sandra testified further, on cross-examination:

"I knew the purpose of the separating disk because the doctor told me. I knew that it was being used at the time the incident happened.

"*Q.* And didn't you move you tongue or move your head just at that instant?

"*A.* No, sir, I did not.

"*Q.* You are sure of that?

"*A.* I am positive."

As in *Ellering* (p 71), Dr. Battersby "rightly felt that he should account for the wound the instrument manipulated by him inflicted." He did so by testifying:

"*A.* I was using this separating disk. The purpose of the separating disk is to make sufficient space between the teeth to place a band in order to pack the teeth with the silver metal used for filling. As I was using the disk, she moved and [the] disk contacted her tongue.

"*Q.* As you were using the disk she moved and that is it?

"*A.* That is the way it happened.

"*Q.* Which way did she move, doctor?

"*A.* How am I supposed to tell you that. She gave a little jerk. That is all.  * * *

"I started to use the disk, and there was, I don't know if you would call it convulsive movement or reflex action on the part of Sandra, and the disk struck her tongue.

"Immediately as it touched her tongue, I attempted to turn the—I turned it off and removed the disk, the instrument from her mouth, and I began to take measures to stop the bleeding. Also, in thinking that perhaps the disk might be carrying bacteria, I gave her penicillin. And, then, I wanted consultation on the case; so, I called Dr. Heilman, rather, I had our secretary call, and Dr. Kemler who is a physician downstairs, Dr. Kemler came up and I believe he put 2 stitches in the tongue.

"After the cutting 1 stopped the motor immediately. I then tried to aid Sandra every way possible. I had further consultations. Finally I took her to the hospital in my car. Dr. A. L. Rehfield was called at my request. *   *   *

"*The Court:* I don't know whether I quite understand. Just the instant before this accident occurred, had there been any movement on the part of the patient?

"*A.* Well, I constantly warn patients to sit still. I always try to take precautions I feel necessary. The disk had to be rotating clockwise when used on the left side, your Honor. You can see that it is moving in a direction towards the cheek; so, I was holding the cheek away from that movement. Now, I don't know whether it was reflective action on the part of the patient or not but the movement produced the disk movement to the tongue and the tongue was cut.

"*The Court:* What I want to know is whether there was any sudden movement of the patient immediately preceding the accident?

"*A.* Well, just—that is when it happened, when the disk hit the tongue. It was because of the movement.

"*The Court:* Well, I am not quite clear. I don't know whether the jury is or not as to whether there was any sudden movement on the part of Sandra that caused the disk to slip.

"*A.* That is what I testified, Your Honor, that there was.

"*The Court:* How do you describe that movement?

"*A.* Well, Your Honor, I think you and any member of the jury has sat in a dental chair and given a little jerk when a dentist started working on them. I know I have sat in a chair myself and done the same thing.

"*The Court:* Well, is that your description of what happened in this case?

"*A.* I don't know exactly, sir, how much she moved.

*"The Court:* Well, is the slipping of the disk on the tongue or on the cheek a very common occurrence?

*"A.* I would say that it happens probably to every dentist during the course of his practice.

*"The Court:* That is all."

Decision of defendants' motion for direction having been reserved,* and the jury having returned a verdict in favor of Sandra in the sum of $5,000 and a verdict in favor of Sandra's mother in the sum of $947.75, the trial judge granted motion for judgments notwithstanding such verdicts and entered judgments accordingly. The named plaintiffs have appealed.

*First:* Defendants rely on the general rule that an action of present nature must be supported by admissible opinion testimony tending to show that the requisite degree of professional care has not been exercised. The rule is considered at length in annotation, 141 ALR 5, headed "Necessity of expert evidence to support an action for malpractice against a physician or surgeon." Michigan follows it (*Zoterell* v. *Repp,* 187 Mich 319; *Delahunt* v. *Finton,* 244 Mich 226; *LeFaive* v. *Asselin,* 262 Mich 443; *Nemer* v. *Green,* 316 Mich 307). That it applies to corresponding actions against dentists will be seen on examination of the annotation, 129 ALR 101, 116, headed "Duty and liability of dentist to patient."

Plaintiffs say, however, that the cases at bar fall within a recognized exception, exemplified in *LeFaive* v. *Asselin, supra.* We turn, then, to authority wherein such exception has either been applied or denied in like instances of oral injury. *Ellering* and *Vale* will lead review, since plaintiffs emphasize

---

* See CL 1948, § 691.691 (Stat Ann 1955 Cum Supp § 27.1461).— REPORTER.

the first and defendants stress the latter. *Vale,* earliest of the two (1920), is considered first.

In *Vale* "plaintiff sustained an extensive cut and severe injuries to her mouth and tongue   *   *   * by reason of the fact that the disk passed from the tooth to the bottom of the plaintiff's mouth and came in contact with her tongue." The court said (p 423):

"There is no room here for the application of the doctrine of *res ipsa loquitur.* Negligence of the defendant cannot be inferred from the fact of injury under the circumstances in this case. This injury may be the result of pure accident, it may be the result of an unconscious, involuntary movement on the part of the plaintiff. The finding of the jury that she did not move her head was necessarily based solely on the testimony of the plaintiff. She may have moved her head involuntarily, or the action of her muscles may have been spasmodic. The fact that the cut is in the bottom of the mouth at the juncture of the tongue with the bottom of the mouth is a circumstance which indicates that the tongue was moved in some way from the position occupied just before the accident. The finding of the jury amounts to a finding that she did not consciously move her head or jerk her tongue, and no more."

On such reasoning it was held (p 425) that there was no room for an inference of negligence on the part of the defendant and, there "being no other evidence of negligence on defendant's part," that "the motion to set aside the verdict should have been granted."

We note, before passing to *Ellering,* that the defendant dentist insisted (p 422) "the injuries were due to the fact that the plaintiff moved her tongue or jerked her head and were therefore the result of her own negligence," whereas in the cases before us defendants do not claim Sandra's tongue moved. They do claim that "she moved" or gave "a little jerk." We note further that the court in *Vale* as-

sumed to interpret the jury's finding* as amounting to no more than a determination that plaintiff did not *"consciously* move her head or jerk her tongue." Whatever the practice may be in Wisconsin, our duty in present position is clear. We must accept as true Sandra's testimony that she did not move as claimed by defendants.

Turning now to *Ellering:* In that case plaintiff's tongue was similarly injured by the defendant dentist during use of a like electrically-driven disk. The question before us was considered at greater length than *Vale* discloses. *Vale* was discredited on ground which, to us, appears valid. Referring to *Vale,* the court said (p 72):

"The court there, however, stresses the point that negligence of the dentist depended upon his ability to stop the revolution of the disk instantly, whereas it seems to us that the negligence, if any, *consists in permitting the disk to slip or be diverted from the place it was to grind to tissues not intended to be touched.*"

Pursuing such distinction—that the injury to Mrs. Ellering's tongue was not produced by any intended treatment and that proper practice was not therefore directly involved—, the court refused to follow *Vale* and adopted reasoning shown in what appear to be the leading cases of *Evans* v. *Roberts,* 172 Iowa 653 (154 NW 923); and *Vergeldt* v. *Hartzell* (CCA), 1 F2d 633.

*Evans* (referred to in *Whetstine* v. *Moravec,* 228 Iowa 352, 372 [291 NW 425, 434], as having "been widely and approvingly cited") is the case of successful removal of a little child's adenoids, and unintentional removal of a small part of the child's tongue,

---

* The jury found (p 422) that the plaintiff, "immediately before the injury, did not move her tongue suddenly or violently and did not jerk her head."

by the defendant physician. The court said (pp 658, 659):

"This is not the ordinary case where a practitioner is sought to be charged with liability for alleged improper treatment of some bodily ailment or infirmity. He was employed to remove the adenoids from the plaintiff's throat, and there is neither claim nor proof that he did not successfully remove them. His negligence, if any, was in failing to take due care to avoid injury to the undiseased parts in the vicinity of which the operation was performed; and while it may be true that, had the operation upon the adenoids been unsuccessful and disappointing, no inference of negligence or want of skill would arise therefrom, it does not follow that this rule applies with the same force to an injury done by him to sound and undiseased parts of the plaintiff's person, which he was not called upon to treat and did not pretend to treat. If a surgeon, undertaking to remove a tumor from a person's scalp, lets his knife slip and cuts off his patient's ear, or, if he undertakes to stitch a wound on the patient's cheek, and, by an awkward move, thrusts his needle into the patient's eye, or, if a dentist in his haste leaves a decayed tooth in the jaw of his patient and removes one which is perfectly sound and serviceable, the charitable presumptions which ordinarily protect the practitioner against legal blame where his treatment is unsuccessful are not here available. It is a matter of common knowledge and observation that such things do not ordinarily attend the service of one possessing ordinary skill and experience in the delicate work of surgery. It does not need scientific knowledge or training to understand that, ordinarily speaking, such results are unnecessary and are not to be anticipated, if reasonable care be exercised by the operator. When they do happen, then proof of other facts and circumstances having any fair tendency to sustain the charge of negligence will be sufficient to take the question to the jury, and this may be true even though, if the alleged negli-

gence pertained solely to the treatment of the diseased parts, the court might be inclined to dispose of it as a matter of law."

*Vergeldt* (quoted with approval in the case of *Calhoun* v. *Fraser*, 23 Tenn App 54 [126 SW2d 381]) was another action for injury inflicted to plaintiff's tongue by a rapidly revolving dental disk. The trial court directed a verdict on strength of *Vale*. The court of appeals, on review, refused to follow *Vale* and proceeded to adopt *Evans'* reasoning, quoted above. In each of these cases—*Evans* and *Vergeldt* —the same position was taken by the defense as is advanced in the cases before us, *viz.*, that the action could not be maintained in the absence of admissible opinion testimony tending to show that the respective defendants were guilty of want of requisite care.

*Brown* v. *Shortlidge*, 98 Cal App 352 (277 P 134) (followed in *Vonault* v. *O'Rourke*, 97 Mont 92 [33 P2d 535]), is another case of injury to a child inflicted in course of preparation for removal of the child's tonsils and adenoids. The jaw was fractured and a tooth knocked out. *Vergeldt* and *Evans* were quoted and applied. The court said, in the way of presently appropriate summary (p 357):

"If a patient should visit a surgeon for the purpose of having a mole removed from the right foot and awoke from an anesthetic minus his left arm, it is certain that some satisfactory explanation would be required to stop the fact itself from broadly proclaiming the negligence of the surgeon. The difference between such a case and the case at bar is one of degree only. If the surgeon in the case at bar could stand upon some imaginary rule of law to the effect that when one submits himself to surgical treatment he may expect anything to happen, so likewise could the surgeon in the supposed case. We think the true rule is expressed

in the cited cases, and the distinction made plain between cases involving the merits of a diagnosis, and scientific treatment and cases where, during, the performance of surgical or other skilled operations an ulterior act or omission occurs, the judgment of which does not require scientific opinion to throw light upon the subject."

*Ellering* proceeds on strength of prevailing authority holding that, in cases of instant nature, direct proof unsupported by expert opinions is sufficient, if believed by the trier or triers of fact, to warrant an inference of negligence. Accordingly, and since application of *Ellering's* rule will wholesomely tend to arrest—by eliminating need thereof in presently considered instances—the known evils of expert testimony,* we cheerfully adopt it as an exception to the general rule recognized at outset of this opinion. The exception so adopted will apply to cases where healthy and undiseased parts of the body requiring no treatment are injured, during the professional relationship, under circumstances where negligence may legitimately be inferred, as in these Higdon cases.

*Second:* It is said that *Ellering* arrives from a State wherein the doctrine *res ipsa loquitur* ("the thing speaks for itself") is recognized and applied— whereas Michigan continues to reject the doctrine. It is more accurate to say, I think, that we apply

---

* More than 80 years ago this Court found occasion to say, in *People* v. *Morrigan,* 29 Mich 4, 8, that:

"The experience of courts with the testimony of experts has not been such as to impress them with the conviction that the scope of such proofs should be extended. Such testimony is not desirable in any case where the jury can get along without it; and is only admitted from necessity, and then only when it is likely to be of some value."

The first sentence of such quotation was repeated 2 decades ago in *In re Estate of Astolas,* 273 Mich 189, 194 (101 ALR 760). It is as true today as it was in 1874. Jones tells us (2 Jones, Commentaries on Evidence [The Blue Book of Evidence], § 372, p 909): "It is generally safer to take the judgments of unskilled jurors than the opinions of hired and generally biased experts."

*res ipsa loquitur* as we primly deny doing so. Do we not declare from time to time that negligence may be inferred from and established by circumstances? Do we not regularly rule—as in the recent case of *Kaminski* v. *Grand Trunk W. R. Co.*, 347 Mich 417—that a want of ordinary care may be found from things which, literally, "speak for themselves?" Time has long since expired for open confession, here in our lofty quarters, of that which is perfectly obvious to every careful student of torts and evidence. Dean King, of the Detroit College of Law, led the way a decade ago when he said:*

"The Supreme Court continues to say that the doctrine of *res ipsa loquitur* does not apply in Michigan and then proceeds to apply it. *Curtis* v. *Sears, Roebuck & Co.*, 298 Mich 539, is an especially extreme case. * * *

"In an action by plaintiff for the damages, the Supreme Court held that defendant's liability was a question for the jury. They said that the happening of an accident is not by itself evidence of negligence, but that negligence may be established through circumstantial evidence. The former is what the Michigan court means when it says that *res ipsa loquitur* does not prevail in this State; actually it is the latter which is the true doctrine of *res ipsa loquitur*."

More will have to be said, in future cases, of our position vis-a-vis that which is known to the law of negligence as *res ipsa loquitur*. It is sufficient for present purposes to say that the decisions approved above are not distinguishable from Sandra Higdon's case on any valid ground. With exception of *Vale*, it appears that the weight of applicable authority uniformly holds that a jury of right may infer negligence from lay proof adduced as at bar. This amounts to no more than proper application

* "Some Memorabilia of Michigan Law, 1940–45" (25 MSBJ, No 5, p 339, May, 1946).

of our own rules of evidence, name them in Latin or otherwise.

*Third:* During oral argument of these cases, and in response to a question from the bench, defense counsel pointed to Sandra's testimonial use of the words "seem" and "seemed"* and questioned evidentiary worth of that which plaintiffs' counsel had previously stressed, *viz.,* that Sandra's testimony showed, unlike *Vale,* that Dr. Battersby did not imediately stop or disengage the disk when it started to cut.

In view of our announced holding it is probably unnecessary to consider whether failure to immediately disengage the disk from the tongue, after it had moved from the teeth to the tongue, separately warranted an inference of negligence. Nevertheless, and since 2 of my Brothers deem the point to be of some importance, I will simply say that Sandra's qualification of her testimony in such regard did not destroy the favorably-viewed value thereof. So qualified, her testimony to that point was admissible for whatever worth the jury saw fit to give it. As was said in *Mimbs* v. *State,* 2 Ga App 387 (58 SE 499) (a case wherein the point was pursued at length):

"A witness may testify to facts with a degree of certainty less than that of absolute positiveness. Many men guard their statements as to facts concerning which they are most certain, with expressions indicative of doubt. With some people, notably the Scotch, this cautiousness is almost a national trait. But that the witness is not willing to state positively the existence of a fact of which, from the nature of things, he has some knowledge does not render his testimony inadmissible. The statement of the wit-

---

* We repeat, for convenience, the testimony scrutinized here: "and then, all at once, the drill just went off my teeth on to my tongue and *it didn't seem* like he took it out right away. *It seemed* to be there for a second or so before he took it out."

ness in this case, 'It seemed to me that he closed the door behind him,' taken in connection with the context, manifestly showed that the witness was not attempting to give his opinion, but to state the impression of his mind as to a fact concerning which his recollection or ability to see perfectly would not permit him to state with more positiveness."

To recapitulate: Paraphrasing the *LeFaive Case*, it was unnecessary for the plaintiffs to show that it was not good professional practice (in the locality) for a dentist to cut deeply (the verdict and absence of claim of excessiveness thereof reflect extent of Sandra's injury) into a patient's tongue while working on that patient's teeth. A jury question was presented as to negligent and nonnegligent causation. That question was resolved by the jury in favor of plaintiffs. We therefore rule that the motion for judgments should have been denied and that judgments on the respective verdicts should have been entered.

Reversed and remanded for entry of judgments accordingly. Cost to plaintiffs.

Smith, Edwards, and Voelker, JJ., concurred with Black, J.

Carr, J. (*concurring*). The defendants in these cases insist that the trial judge was correct in entering judgments on motions notwithstanding the verdicts of the jury, on the ground that plaintiffs could not establish their alleged causes of action without expert testimony and that there was no proof of negligence on the part of defendant Battersby unless it is inferred from the mere fact that plaintiff Sandra Higdon sustained an injury. With such claims we are unable to agree. It is doubtless true that in the majority of malpractice cases expert testimony is essential to enable the triers of the facts

to reach correct conclusions. Such is the situation where questions of treatment are involved, or other matters with reference to which laymen, as a general rule, are not informed. The value of the opinions of those who are skilled in such matters is obvious whenever expert testimony is necessary to establish pertinent and material facts in the trial of cases.

In the cases at bar, however, we are not concerned with matters of treatment by defendant dentists but, rather, with the use of a mechanical appliance. Obviously it was the duty of defendant Battersby in the use of the so-called separating disk to observe a degree of care commensurate with the possible results that might ensue from inattention to the work or otherwise negligent handling of the equipment employed. The question at issue is whether there was in fact negligence constituting the proximate cause of the injury. Bearing in mind the nature of the question, we think the cases fairly fall within the line of decisions in this State in which it has been recognized that expert testimony is not essential to the establishing of a cause of action for damages resulting from negligence in cases of the character here involved. Among such decisions are: *Sullivan* v. *McGraw*, 118 Mich 39; *Ballance* v. *Dunnington*, 241 Mich 383 (57 ALR 262); *LeFaive* v. *Asselin*, 262 Mich 443; and *Winchester* v. *Chabut*, 321 Mich 114.

This Court has never approved the *res ipsa loquitur* rule. It has been repeatedly said that the mere fact that an accident, or an injury, has occurred is not proof of negligence. It is equally well established that permissible inferences may be drawn from facts. In *Burghardt* v. *Detroit United Railway*, 206 Mich 545 (5 ALR 1333), it was said by Mr. Justice Fellows, who wrote the opinion of the Court (pp 546–548):

"This Court has not adopted the rule *res ipsa loquitur;* we have uniformly held that the happening of the accident alone is not evidence of negligence; and we have as uniformly held that negligence may be established by circumstantial evidence, and that where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inferences from established facts that at least a prima facie case is made. *Alpern* v. *Churchill,* 53 Mich 607; *Barnowsky* v. *Helson,* 89 Mich 523 (15 LRA 33); *LaFernier* v. *Soo River Lighter & Wrecking Co.,* 129 Mich 596; *Stowell* v. *Standard Oil Co.,* 139 Mich 18; *Elsey* v. *J. L. Hudson Co.,* 189 Mich 135 (LRA 1916B, 1284); *O'Donnell* v. *Lange,* 162 Mich 654; *Harris* v. *Royal Oak Savings Bank,* 187 Mich 407; *Sewell* v. *Detroit United Railway,* 158 Mich 407; *Gerstler* v. *Weinberg,* 160 Mich 267; *Congdon* v. *Detroit, Jackson & Chicago R. Co.,* 179 Mich 175; *Bayer* v. *Grocholski,* 196 Mich 325.

"In *Barnowsky* v. *Helson, supra,* it was said (pp 524–527):

" 'In this case the falling of the roof was in and of itself some evidence that the work of raising it was not being done with the ordinary care and skill. It is true that the mere fact of any injury does not impute negligence on the part of any one, but where a thing happens which would not ordinarily have occurred if due care had been used, the fact of such happening raises a presumption of negligence in some one. \* \* \*

" 'This roof not properly supported would fall as a natural result of the laws of gravitation, but if properly braced there would be no reason for its falling from that cause, and it would not fall from any other cause without the interposition of the elements or some human agency. Therefore, without any other showing than that it suddenly gave way, slipped or tipped to one side, and fell, the presumption is almost conclusive that it fell because it was not sufficiently braced or stayed.'

"In *Sewell* v. *Detroit United Railway, supra,* Mr. Justice Montgomery, speaking for the Court, said (pp 409, 410):

" 'It is the settled rule of this State that negligence of the defendant must be proved, and that an inference of negligence is not to be drawn from the mere fact of an accident. But it has also been held in numerous cases that the circumstances attending an injury may be such as to justify an inference of negligence. As in the present case, if all that appeared had been that the plaintiff was riding in a car of the defendant under the control of its servants, and the car in which plaintiff was riding continued its course until it collided with another car ahead of it standing still, with sufficient force to push the still car ahead 75 feet, the inference that some one had blundered prima facie would be the most natural one to be drawn, and that inference is so clear that it would not require further proof of negligence on the part of the defendant.' "

The rule, as above stated, has been repeatedly referred to with approval in subsequent decisions, among which are: *Fish* v. *Grand Trunk Western Railway,* 275 Mich 718; *Macres* v. *Coca-Cola Bottling Co., Inc.,* 290 Mich 567; *Pattinson* v. *Coca-Cola Bottling Company of Port Huron,* 333 Mich 253; and *Crase* v. *City of Detroit,* 341 Mich 132. An interesting comment on the Michigan rule will be found in 65 CJS, Negligence, § 220(2), pp 991, 992.

In the case at bar the testimony of plaintiff Sandra Higdon is in conflict with that of defendant Battersby. The latter insisted that the cause of the injury was a movement on Sandra's part, which resulted in bringing the disk in contact with her tongue. He further claimed that he ceased operating the disc at once following the contact. It was the claim of Sandra that she did not move, and that the disk was not removed "right away" after it contacted her tongue. Under the accepted rule in this State the

testimony must be construed as strongly as possible in favor of the plaintiffs. *Grover* v. *Simons,* 342 Mich 480, and prior decisions there cited.

It may be assumed from the verdicts returned that the jury determined the facts in accordance with the proofs introduced by plaintiffs. Obviously such proofs negative the explanation of defendants as to how the injury occurred. Under the rule recognized in the *Burghardt Case, supra,* and other decisions of like character, it was within the province of the jury to draw inferences from established facts, subject to the limitation that negligence could not be inferred from the mere occurrence of the accident and injury. It was within the province of the jury to accept the testimony of plaintiff Sandra, and to give such weight thereto as was deemed proper.

Defendants direct attention to *Vale* v. *Noe,* 172 Wis 421 (179 NW 572), in which a judgment for the plaintiff, in a case somewhat similar to those now at bar, was reversed. The opinion indicates, however, that the appellate court concluded that freedom from negligence on the part of the defendant was shown by undisputed testimony. Be that as it may, we do not regard the decision as controlling here. Each case of this nature must necessarily rest on its own facts. We think that plaintiffs were entitled to have the issues involved submitted to the jury, that the verdicts returned were supported by sufficient evidence, and that judgments notwithstanding the verdicts should not have been entered.

Remanded with directions to set aside the judgments and to enter judgments in accordance with the verdicts returned by the jury.

DETHMERS, C. J., and SHARPE and KELLY, JJ., concurred with CARR, J.