CALIXTA EMMANUELLI WIDOW OF TORRES, Plaintiff and
Appellant, *v.* CAREY C. WOMBLE and ST. LUKE MEMORIAL
HOSPITAL, Defendants and Appellees.

No. R-68-8.     Decided April 27, 1971.

*Carlos J. Irizarry Yunqué* and *Práxedes Álvarez Leandri* for appellant. *Rivera Zayas, Rivera Cestero & Rúa, Rodolfo Cruz Contreras,* and *Adrián Mercado* for Carey C. Womble. *Martín, Amadeo & Benet* for St. Luke Memorial Hospital.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The question raised in this case is whether the appellees should be held liable for the damages sustained by appellant as a result of a fistula complication when she was submitted to a hysterectomy. Under the circumstances of this case recited below, we conclude they should not, and therefore, we affirm the decision of the trial court.

Appellee-surgeon, Dr. Carey C. Womble, performed a hysterectomy on appellant on October 17, 1963, in the appellee hospital because a carcinoma "in situ" (a malignant new growth) had developed in the cervix uteri. The trial court concluded that:

"Calixta was discharged from the hospital on October 26 and she was given appointment for November 1, 1963 when she returned to Dr. Womble and stated that she was continuously discharging urine from the vagina and in such amounts that she had to use a towel to protect herself.

"Dr. Womble informed Calixta that it was a complication of the operation, that she had to be hospitalized again for new tests and consultation with an urologist.

"On November 5, 1963, she returned to Saint Lucas Hospital and Dr. Womble called Dr. Gilberto Rodríguez, who examined Calixta and found that she had a vesicovaginal fistula. On November 16, 1963, she was discharged after the third confinement, Dr. Womble and Dr. Rodríguez agreeing that Calixta would continue under treatment with the latter for the urological complications.

"The vesicovaginal fistula is an ulcer in the bladder connected with the vagina which permits the urine to flow from the bladder to the vagina. In cases like this, the fistula may develop by the perforation of the bladder during the operation or by necrosis caused by dead tissue.

"From the clinical record, as well as from the expert evidence, there is no doubt that the fistula was produced as a consequence of the operation performed upon Calixta by Dr. Womble, but we do not believe that it is a perforation during the intervention, but rather by necrosis caused by the death of the tissues, which is a complication within the operation, which does not necessarily mean that there was carelessness or negligence in the same. The expert witnesses disagree as to the cause of the fistula. The abdominal hysterectomy performed was a complicated operation which lasted four hours, and they found ovarian cysts with adhesions. The patient bled profusely, and the bleeding obstructed the field of vision of the operation.

". . . . . . . . .

"On January 27, 1964, Calixta was confined in the Hospital de Damas to be operated on for the correction of the fistula. On January 31; Dr. Rodríguez operated on her and she remained in said hospital until February 27. The fistula was closed on this occasion.

"After this last operation the discharge of urine through the urethra continued and from June 22 to June 28, 1964, she had to be confined again in Damas for tests performed by gynecologist, Dr. Edgardo Yordán, and by Dr. Rodríguez himself.

"On January 6, 1965, Calixta was hospitalized again in Damas to be operated on the 7th, because the incontinence of urine continued. A urethrocele condition pre-existent on Octo-

ber 17, 1963, was corrected by surgery, and she was discharged on January 27, 1965.

"On March 27, 1966, she was confined in Damas until the 29th of said month, because she had frequent pains on the lower part of the abdomen. An incisional hernia, that is, a hernia in the incision of one of the operations was found, which requires an additional surgical operation.

"The discomfort of having to use constantly for almost four months a rubber tube with a bottle to gather urine from the catheters, the unpleasant smells, the operations to which she was submitted, caused Calixta Emmanuelli widow of Torres great sufferings and mental anguish.

"Calixta has incurred expenses, not covered by medical insurance and hospitalization expenses amounting to $649.78.

"We do not find that from the clinical record corresponding to the operation performed on October 17, 1963, there appears that Dr. Carey C. Womble was careless or negligent in the surgical operation. The vesicovaginal fistula is a complication of the operation which does not necessarily show that there was carelessness or negligence on the part of the physician. We do not consider, neither in the hearing of the case nor now that there was anything suspicious in the clinical record to which we have referred [that of the hysterectomy] and the only thing which preoccupied the court concerning the history of the operation of October 17 was adequately clarified, there remaining no doubts in the trier's mind as to which was the true history, that is, the one that appears in the photocopy whose original is not attached to the record."

Relying on the grounds that (1) appellant's evidence did not show clearly and definitively that the damage suffered by her resulted as the sole and direct consequence of an act of negligence on the part of the appellee-physician; (2) the negligence of a physician cannot be established by a mere proof that the treatment followed was not effective or that an ill consequence followed and that (3) in the light of the facts proved it did not find any act or omission of the appellee-physician indicative of his negligence, the trial court dismissed the complaint in this case.

The evidence consisted of the testimony of three medical experts, that of appellant, that of her son, that of nurse Noemí Muñoz, and of the hospital records. The expert evidence was conflicting.

Appellant testified that when she woke up after the operation she had a severe headache and she was wet all over in her bed; that she called Dr. Womble who came the next day and when he became aware of the situation he admitted that "you had bad luck in your operation . . . because I brushed your bladder too much and I noticed that it was being perforated." Then she explained the different treatments and operations to which she was submitted as a result of the fistula which developed in her bladder. She explained the sufferings and anguish she had undergone as a result thereof. She testified as to the expenses she incurred as a result of her disease amounting to some $668; that she informed her attorneys about said admission made by Dr. Womble. This occurred before the taking of the deposition of Dr. Womble; that she did not tell Dr. Rodríguez and Dr. Yordán of the said Dr. Womble's admission.

Appellant's expert witness, Dr. David Graubard, testified that his experience is 50% in traumatic surgery and the rest in general surgery in men and women; that he had not made specialized studies in gynecology or gynecological surgery. As to the cause of the fistula in question he testified that his view was "that in performing the total hysterectomy the surgeon injured the bladder with a hemostatic clamp, by a hemorrhage or by dissection of the bladder . . . of the cervix uteri." Immediately he added that after a more careful examination "based on the subsequent facts" his opinion was that "an incorrect suture made along the wall of the bladder was the basic cause of the vesicovaginal fistula. The reason for this is that on October 18, 1963, the first day after the operation, her urine contained blood." He added that the best practice is to operate for the correction of the fistula within

24 to 48 hours after it is discovered and that the normal capacity of the bladder is 900 or 1000 c.c. On cross-examination he admitted that there is nothing in the record to the effect that appellant was discharging urine from the vagina. He said that said assertion was based on a note in the progress chart as to the incontinency, that is, retention after urinating, which is not indicative of the existence of fistula, that expelling clots from a postoperative wall, after a hysterectomy, is not exclusively due to fistula, but he added that there is connection with the fistula. On examination by appellees' attorney he testified that appellant did not have a fistula on the 18th or 19th of October; that "Possibly it appeared on the 23rd or 24th"; that the uncontrolled elimination of urine and the bed wetting was due to the fistula; that it is a bad practice to fail to make a blood and urine test before the operation; that the record does not show that they were made; that the postoperative orders were written on the day before the operation, which is not a good practice either.

The other appellant's expert witness was Dr. Gilberto Rodríguez, urologist. He testified that in hysterectomy operations fistulas may be produced in two cases. One of them is in case of carelessness like "those in which the walls of the bladder and of the vagina are directly perforated with scissors, with a bistoury . . . clamps . . . a needle when sewing a suture . . . a violent dissection with the hands . . . the bladder could be perforated with a finger. A retractor used for drawing back the edges of the wound could perforate the bladder . . ."; the second group is that of the cases in which the fistula is not due to carelessness, these cases being those in which the fistula is produced "as a result of a tumor . . . a faulty parturition . . . that the bladder may be defective, some illnesses . . . like syphilis"; and that this case does not fall within said second group. He said that "in any number of hysterectomy operations there is always an incidence [of fistula] of about 10%" even if the best operative technique is used; that,

according to the record, he does not believe that Dr. Womble incurred negligence of any kind whatsoever in the operation of appellant. He testified that he had no experience in hysterectomy. He said that, in cases of fistula like this one, three to six months should elapse after the lesion before trying any reparative process; that a person who does not know this rule does not qualify as an urologist; that the person who would say that the treatment of vesicovaginal fistula had to be done within 24 or 48 hours would not qualify as an expert gynecologist and urologist. He said that there was no evidence that in this case there was a fistula which perforated the bladder at the time of the operation; that in this case the fistula was produced by necrosis; that it is possible that it could have been caused by a degeneration or change in the flow of blood; by a decrease in the flow of the blood caused by the operation. He testified that Novak's test in gynecology was correct, text which informs that "Even the best trained and most competent surgeon neurologist, once in a while, has inadvertently caused damage and it has been indicated that an accidental laceration of the bladder occurs in almost 10% of the hysterectomies"; that such laceration may occur there being absolutely no negligence; that "if within the first 48 hours after operating on the patient there is an apparent large fistula it should be operated on; I would operate. If ten days have already elapsed undoubtedly I would not operate. Now then, during that period between two and ten days the case has to be individualized. Of course, when that occurs the tendency is to wait."

Doctor Alberto Castañer, appellees' expert witness, testified that he is a member and has a certificate in his specialty from the American College of Obstetrics and Gynecology and from the American College of Surgery since the year 1958. He has performed not less than four or five hundred hysterectomies and is a professor in his specialty in the School of Medicine since the year 1955. Doctor Castañer testified that

in performing a hysterectomy the most important and constant risk is the laceration of the bladder and the ureters notwithstanding the techniques used and the care given. He testified also that from the record of the operation it appears that the operation performed on Mrs. Emmanuelli was a complicated one by reason of the presence of cysts with many adhesions in the back part of the cervix (of the uterus) and that the more adhesions there are the more difficult it is to establish the flat surfaces for the operation, and consequently the more potential trauma there is. He also pointed out that during the operation the patient bled profusely, obstructing the field of operation thus increasing the difficulty in controlling the situation because of the repeated cleaning and the additional time it takes; that the operation lasted four hours in order to be able to remove the cancer localized in plaintiff's cervix uteri. As to operating on her within the 24 or 48 hours, experience shows that the probabilities of success are less, the tissues do not recuperate if there is necrosis, the tissues have not sufficiently recuperated in 48 hours to submit said patient to a probably successful operation and that it is better to wait until the tissues are clean, the inflammation subsides and then act. He likewise testified that according to his experience Dr. Womble operated within the standards accepted by the profession in Puerto Rico, and like Dr. Gilberto Rodríguez, he affirmed that he could not determine, relying on the record, any sign of negligence whatsoever. He testified that the capacity of a human bladder is 400 to 450 cubic centimeters.

On September 15, 1965, a deposition was taken from Dr. Womble before the trial judge. He testified that for 22 years he has been a general practitioner with specialty in abdominal surgery, having performed about two hundred hysterectomies in four of which there arose the vesicovaginal fistula complication; that on September 30, 1963, appellant Calixta Emmanuelli went to his office referred by Dr. Remy Rodríguez for a gynecological consultation as a result of what

"the pathologist Donald Babbs had found . . . that he had reported a suspicious cytologic specimen . . . ." On October 9, "the patient returned to my office, I told her that the pathologic report was carcinoma . . . I told her that it was an early malignant lesion, in other words, that she was suffering from cancer in said place . . . I told her that it was a fatal lesion unless it was properly treated; I told her that the best treatment was an abdominal hysterectomy; likewise I called Dr. Remy Rodríguez and informed him of the findings and of the treatment recommended and he told me . . . the patient accepted the recommendation and was admitted for operation on October 16, 1963 . . . on October 17, a complete hysterectomy was performed with an excision of the right ovary and tube, and it was successfully performed. On October 26, the patient was discharged from the hospital with a prescription to continue antibiotic therapy which she had started on October 18 for a postoperative cystitis, and appointment was given to her for November 1, 1963. On November 1, the patient came for her appointment and it was stated that she was constantly discharging urine through her vagina in such quantity that she had to use a towel constantly for her protection. . . . I told the patient that this was a complication of the operation and that she had to be hospitalized again for tests including consultations with an urologist; four days later, on November 5, the patient was finally hospitalized . . . finally she came to be hospitalized and I called urologist Gilberto Rodríguez to examine the patient on consultation. Dr. Gilberto Rodríguez examined the patient, made the proper tests and found that the patient had a vesicovaginal fistula; at my request Dr. Gilberto Rodríguez continued taking care of the patient's urologic complications. . . . The patient was discharged on November 16, 1963, under the care of Dr. Gilberto Rodríguez; the last time I saw the patient was in the morning of November 16, 1963, and at that time and on that date Dr. Gilberto Rodríguez and I agreed that she would

continue under his treatment." On cross-examination he testified that "I operated carefully observing all the customary precautions" and mentioned them. He said that ". . . Normally the major precaution in an abdominal hysterectomy is to prevent injury to the bladder and the urethra." He said that he did not perforate appellant's bladder; that "there were certain adhesions between the ovary and the tube on one side and the intestine in the same area"; that appellant did not have symptoms of peritonitis indicative of a perforation of the bladder; that after the operation appellant suffered a cystitis which required catheterization; that the first indication of fistula appeared on October 23 "as a result of an abnormal connection between the vagina and the bladder"; that from the day of the operation until the afternoon of October 23 he visited appellant every day and that he did not notice and the latter did not tell him about the bed wetting with urine nor does such thing appear from the clinical record of the hospital; that this "vesicovaginal fistula appeared at least six days after the operation. She had a postoperative cystitis during those six days . . . it would not have occurred if she had not been favorably operated on, it is a complication of the operation." When asked whether he remembered having told appellant that she had bad luck in said operation, he answered "I do not remember having said such thing, but I think she did have it. Any person on whom a hysterectomy is performed and a vesicovaginal fistula appears has bad luck."

Nurse Noemí Muñoz, supervisor of the operating room, testified that appellant's operation record was partly dictated to her as the operation was being performed by Dr. Womble, and when she had to absent herself, partly to nurse Conesa, and at the completion of the operation the record was signed by Dr. Womble; that ". . . I check the records and if I see that they are not clear or presentable, as they should be, as an operation record should be, I, as supervisor of the operating room, make clear copies of the records" that ". . . when I

checked the record and saw that it had different handwritings, that it had several errors and was crossed out, I decided to make a clear copy in order that it be more presentable and I did so, but leaving in the record the part which was already signed by Dr. Womble and which we had taken, that part remained in the record"; that she took the clear copy of the record to be signed by Dr. Womble, but that he did not sign it. Photostatic copy of the original record and the copy remade by the witness were admitted in evidence. She testified that "Making a clear copy was exclusively my idea." She was amply examined on the alterations made in copying the history of the operation dictated by the appellee-surgeon but it was not shown in what form or manner and to what extent these alterations tended to establish that the fistula was formed as a result of appellee's carelessness or negligence in performing the hysterectomy.

Below we set forth the case law doctrine applicable to the circumstances of this case.

In *Sáez* v. *Municipality*, 84 P.R.R. 515 (1962), we reaffirmed the doctrine established in *Rivera* v. *Dunscombe*, 73 P.R.R. 764 (1952), with respect to the liability of the physician for the damages suffered by a patient. It is unnecessary to repeat it. In *Ramos Orengo* v. *Government of the Capital*, 88 P.R.R. 306 (1963), we reaffirmed the doctrine that in the absence of evidence to the contrary, the presumption is that professionals have exercised a degree of reasonable care and that the treatment administered to the patient was adequate. The plaintiff is bound to controvert this presumption by means of evidence showing that there was more than a mere possibility that the damages to plaintiff were due to the physician's failure to do his duty. In *Guzmán* v. *Silén*, 86 P.R.R. 504 (1962), we said that: "A court is not bound to follow blindly the opinion of an expert, particularly when it is in conflict with other expert testimony" and that "In cases of malpractice what is or is not the proper practice is a ques-

tion for experts and it can be established only by their testimony." In *Pérez* v. *Commonwealth*, 95 P.R.R. 728 (1968), a case where the presumption that the physician exercised due care was controverted by the evidence, we said at page 735: "The professional practice in the community, or prevailing in the community, when . . . is used as a standard . . . does not mean the poor practice but the practice which complies with the acknowledged professional requirements, that is, the accepted practice professionally speaking, in a specific place and time."

■ If the evidence discloses more than one probable cause the physician cannot be adjudged liable unless the evidence shows that the negligent action attributed to the latter is the most probable cause. *Ritter* v. *Sivils*, 293 P.2d 211 (Ore. 1956).

■ In cases of injury within the field of operation there are circumstances where the doctrine of *res ipsa loquitur* has been applied when, according to the facts, the damage would not have occurred in the absence of negligence on the part of the defendant physician.

The case of *Tomei* v. *Henning*, 431 P.2d 633 (Cal. 1967), is illustrative of this group. In this case defendant performed a hysterectomy on plaintiff. During the operation he accidentally sutured her right ureter in two parts and thereafter it became necessary to remove plaintiff's right kidney. Defendant admitted he had sutured the ureter. He alleged it was an unavoidable accident. But he testified that he did not take certain indicated precautions referred to by the expert physicians, like identifying the ureter and conducting tests to determine whether the ureter had been injured. One of the expert witnesses testified that the suturing of an ureter in two places and closing the wound without using any technique whatsoever to determine the condition of the ureters did not constitute the exercise of due care on the part of the

surgeon when performing the hysterectomy. Therefore, the court concluded that it was an error to refuse a conditional *res ipsa loquitur* instruction to the jury. It stated that "Since the res ipsa loquitur instruction permits the jury to infer negligence from the happening of the accident alone, there must be a basis either in common experience or expert testimony that when such an accident occurs, it is more probably than not the result of negligence."[1]

■ On the contrary, in other cases of damages within the field of the operation, it has been decided that the doctrine of *res ipsa loquitur* is not applicable because the damage, by itself, does not establish defendant's negligence.

In *Siverson* v. *Weber*, 372 P.2d 97 (Cal. 1962), 10 days after a hysterectomy was performed there appeared a leakage of urine from plaintiff patient's vagina. A vesicovaginal fistula was found. Plaintiff testified that the surgeon pointed to a chart on his desk and said: "I must have put a suture through the flap of the bladder there [the court said that this term is used in referring to the vesico-uterine reflection of the membrane that lines the interior of the abdominal cavity] which caused the fistula." The surgeon denied having made the statement and explained that such suture is a normal procedure that is done in every case and does not cause fistula. The patient was treated for several months and the fistula was closed by surgery. Medical witnesses agreed that the exact cause of a fistula appearing several days after a hysterectomy cannot be or cannot ordinarily be determined; that fistulas may occur even though the surgeon has exercised the care and skill generally possessed by reputable gynecologists

---

[1] See also, *Clark* v. *Gibbons*, 426 P.2d 526 (Cal. 1967); *Landermans* v. *Hamilton*, 41 Cal. Rptr. 335 (1964); *Horner* v. *Northern Pacific Ben Ass'n Hospital*, 382 P.2d 518 (Wash. 1963); *Gerbart* v. *Fresno Medical Group*, 31 Cal. Rptr. 633 (Cal. 1963); *Cho* v. *Kempler*, 2 Cal. Rptr. 167 (1960); *James* v. *Spear*, 388 P.2d 22 (Cal. App. 1959); *Guillen* v. *Martin*, 333 P.2d 266 (Cal. App. 1958); *Higdon* v. *Carlebach*, 83 N.W.2d 296 (Mich. 1957).

in the community and that the development of a fistula, although rare, is considered an inherent risk of the operation. The court stated that "It is obvious that neither the cause of plaintiff's fistula nor the question whether, in the light of past experience, it was probably the result of negligence by defendants is a matter of common knowledge among laymen. . . . No medical witness testified that in the rare cases where fistulas occur they are more probably than not the result of negligence. As we have seen, the testimony was that they are considered an inherent risk of the operation and that they may occur where the operation is performed carefully and in accordance with the proper practice. . . . The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation . . . . To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used." The court concluded that in cases like this one, the doctrine of *res ipsa loquitur* is not applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than of some cause for which defendant is not responsible.

In *Klinger* v. *Henderson*, 81 Cal. Rptr. 305, 309 (Cal. App. 1969), the facts were distinguished from those in *Siverson, supra*, and the granting of new trial to plaintiff was sustained because the evidence showed that the fistula, which developed in the patient on whom a hysterectomy was performed, was caused by the kinking or compression of the ureter when the defendant surgeon applied a hemostatic clamp on a bleeding branch of the uterine artery; that medical

testimony, susceptible of interpretation that such an injury rarely occurs in the absence of negligence on the part of the surgeon, was alleged.[2]

Let us consider below appellant's assignments in the light of the foregoing summary of the evidence and of the applicable law previously set forth.

■ 1.—Appellant argues that the trial court applied a mistaken standard in weighing the evidence, which standard has been discarded in view of the defenseless and inferiority situation in which appellant is in cases of professional liability.

The cases cited by appellant do not support this assignment. In some of them, the circumstances justified the inference of negligence.[3] In *Dees* v. *Pace*, 257 P.2d 756 (Cal. App. 1953), the doctrine reaffirmed by the Supreme Court of California in *Siverson* v. *Weber, supra,* was applied. In *Colvin* v. *Warren*, 163 S.E. 268 (Ga. App. 1932), only a demurrer was denied because the complaint was sufficient in alleging that the physicians, in performing the operation unnecessarily, cut plaintiff's bladder and other organs, resulting in the improper functioning of the bladder. In *Linscott* v. *Hughbanks*, 37 P.2d 26 (Kan. 1934), it was held that a hypothetical question, to the effect of whether medical witnesses could state an opinion as to whether the surgeon who performed a hysterectomy and two other operations to correct the patient's condition which resulted in the injury of a ureter, fistula in the bladder, and in the patient suffering from a

---

[2] See, also, *Schofield* v. *Idaho Falls Latter Day Saints Hosp.*, 409 P.2d 107 (Idaho 1965); *Buchanan* v. *Downing*, 394 P.2d 269 (N. Mex. 1964); *Di Filippo* v. *Preston*, 173 A.2d 333 (Del. 1961); *Shockley* v. *Payne*, 348 S.W.2d 775 (Texas 1961); *Christian* v. *Widmington General Hospital Ass'n*, 135 A.2d 727 (Del. 1957); *Bettigole* v. *Diener*, 124 A.2d 265 (Md. 1956); *Robinson* v. *Wirts*, 127 A.2d 706 (Pa. 1956).

[3] *Hundley* v. *St. Francis Hospital*, 327 P.2d 131 (Cal. App. 1958); *Goodwin* v. *Hertzberg*, 201 F.2d 204 (D.C. Cir. 1952); *Byrom* v. *Eastern Dispensary & Casualty Hospital*, 136 F.2d 278 (D.C. Cir. 1943); *Christie* v. *Callahan*, 124 F.2d 825 (D.C. Cir. 1941).

continual drainage of urine after the third operation, used the ordinary skill and care which surgeons practicing in the vicinity used in like operations, was properly framed, since a negative answer constituted a fact from which the jury could find negligence. The reason to admit said question was that every fact included in the same was supported by the circumstantial evidence and defendant's admissions.

Appellant does not allege any other reason to induce us to modify or substitute the prevailing doctrine. On the contrary, the record shows that she had two medical experts who testified in her favor and whose conflicting testimony was properly weighed by the trial court as we shall show hereinafter.

▪ ■ 2.—Appellant assigns that the trial court erred in applying the doctrine of the practice accepted and followed by the medical profession because it based its decision on a copy of the operation record which appears altered, the court lacking any other evidence as to how the operation was performed and that this altered copy of the record was used by appellee's expert witness to set forth his opinion that the generally accepted practice was followed in the operation.

A photostatic copy of the original record dictated by the appellee-surgeon while performing the first operation in this case and signed by him at the conclusion thereof appears in the record. We must assume that the experts examined it and based their testimony on said copy of the original admitted in evidence without appellant's objection, as well as on the copy appearing in the hospital record with alterations and without the signature of the appellee-surgeon. The alteration which attracts attention is an addition to the text dictated by appellee during the operation, which originally read that "the bladder was separated (dissected) from the cervix." The alteration consisted in adding here the phrase "by gentle separation (dissection) with a gauze." The absence of this addition need not necessarily alter the conclusion of the expert

witness and of the court in the sense that the operation was performed in accordance with practices established and followed by the profession for this type of operations since from the reading of the rest of the original record it could be assumed that the operation was performed in accordance with such practices as it was affirmed by appellee in the course of his deposition. As we shall see hereinafter, appellant argues that said method of dissection was improper. The trial court took into consideration the discrepancies which appear in the copy of the operation record made by nurse Muñoz after the operation and which appellee never signed, and concluded correctly, in our opinion, that "We do not consider . . . that there was anything suspicious in the clinical record . . . the only thing which preoccupies the court concerning the history of the operation was adequately explained. . . ."

3.—Appellant argues that the trial court, in applying the said doctrine, ignored that in this case there were deviations from the practice in question.

Although it is true that Dr. Graubard testified that the record does not show that blood and urine tests were made immediately before the operation (they had been made several days before) and that the postoperative orders were written on the day before the operation, which in his opinion is a poor practice, it was not shown that these circumstances contributed in any manner whatsoever to the development or occurrence of the fistula.

Appellant maintains that the dissection of the bladder with a gauze, as it appears from the altered record, is contraindicated because it weakens the tissues and causes necrosis. In support thereof she cites a text in medicine which among other things, states that the author never uses a sponge or the fingers to push the bladder to separate it from the cervix and from the vagina. On the contrary the testimony of Dr. Rodríguez and Dr. Castañer was to the effect that the record did not show that the appellee-surgeon incurred any

negligence in performing the hysterectomy in question. Specifically, as to the best method for the aforementioned dissection Dr. Castañer testified that the simplest method to separate the bladder "is using a gauze with the finger."

Appellant also assigns that the postoperative treatment departed from the accepted practices. We assume that she relies on appellant's testimony. However, it is not supported by the hospital record and is evidently in conflict with appellee-physician's testimony. The question having been settled by the trial court, we find no justification to disturb its weighing of the evidence.

4.—It is assigned that the trial court did not take into consideration the testimony of expert witness Dr. Graubard.

It is true that credit was not given to said evidence, but we cannot agree with appellant that the court lacked grounds therefor. The witness was not a specialist in the genitourinary field. His opinion that the fistula in this case was due to an incorrectly performed suture through the wall of the bladder does not find support on the medical record of the case or on the testimony of Dr. Rodríguez, appellant's expert witness who operated on her to correct the fistula, for which reason he was in a better position than any other person to corroborate Dr. Graubard's opinion concerning the cause of the fistula. However, he was not examined specifically on this matter and as to whether or not when he operated he found such suture or condition which in any manner whatsoever would justify that it had been done.

Dr. Graubard's testimony to the effect that the fistula in cases like the one at bar should be operated within 24 to 48 hours after it is discovered was rebutted and contradicted by Dr. Gilberto Rodríguez by the asseveration that the person who said such thing would not qualify as expert in gynecology and urology. His testimony as to the capacity of the bladder was contradicted by Dr. Castañer.

On the contrary, the conclusion of the trial court in the sense that the fistula did not occur as a result of carelessness or negligence on the part of the appellee-physician is amply supported by the evidence. The latter shows that the fistula is rather a risk inherent in every hysterectomy and it may occur even where the operation is performed carefully and in accordance with the practice accepted and followed by the medical profession in such cases. *Siverson* v. *Weber, supra.*

■ 5.—Appellant assigns that the court disregarded Dr. Gilberto Rodríguez' testimony concerning all the possible causes of the fistula, and that the one developed in this case is in the group caused by carelessness or negligence, testimony which justified the application of the doctrine of *res ipsa loquitur.*

Although it is true that Dr. Rodríguez' testimony in part supports the inference that the fistula in this case falls within the group that occurs as a result of carelessness, it is not less true that this witness testified that in hysterectomy operations there is an incidence of fistula in some 10% of the cases; that the fistula could have occurred as a result of degeneration or disturbance or disminution of the flow of blood; that the *laceration of the bladder in these cases may occur* under absolute absence of negligence and that, relying on the record, he did not believe that Dr. Womble incurred negligence of any kind whatsoever in the operation performed on appellant.

Likewise, Dr. Castañer testified that the greatest risk in a hysterectomy is a necrosis, that is, damage to the bladder and the ureters even though operating under the best techniques and care possible; that the operation in this case was very complicated due to the presence of cysts and profuse bleeding; that Dr. Womble operated within the norms accepted in Puerto Rico; and that he could not, relying on the record, determine any indication of negligence in this case.

As the court said in *Siverson* v. *Weber, supra,* in cases like this an inference of negligence is not permissible.

■ 6.—The court did not give credit to appellant's testimony consisting of an admission of Dr. Womble in the sense that during the operation "he had brushed the bladder", testimony which was not controverted.

This testimony was not controverted by Dr. Womble himself who was the only person who could controvert it. The reason is obvious. During his deposition (which was necessary because the witness was going away to enter a seminary to study priesthood) Dr. Womble was examined on all the aspects of the case. His attorneys, presumably, were not acquainted with the alleged admission. However, appellant, who was acquainted therewith, did not examine him as to the same. On the other hand, from Dr. Womble's testimony it seems doubtful that he did so. Appellant's records as patient of the appellee hospital as a result of the hysterectomy to which she was submitted, as well as Dr. Womble's testimony, and to a certain extent, that of Dr. Rodríguez, contradict and rebut appellant's testimony to the effect that when she woke up after the operation she noticed that she had wet her bed with urine, insinuating that from that very moment the fistula in question existed (which meant that the bladder had been perforated during the operation). The expert witnesses agreed that this complication appeared six days after the operation, so that the fistula developed by necrosis of the bladder tissue. This circumstance tended to diminish the credibility of appellant's testimony. Therefore, there is no justification in the record to conclude that the trial court abused its discretion in refusing to give credit to appellant's testimony concerning said admission.

7.—In assigning that the trial court disregarded the provision of § 162 of the Law of Evidence, appellant argues that Dr. Womble was not brought to explain the question of the altered copy of the operation record nor were the testi-

monies of the anesthesiologists and other assistants mentioned in the operation record adduced, preferring to rely on the imperfect and unsatisfactory record of nurse Noemí Muñoz, for which reason the court should have considered suspiciously the testimony of the latter, the copy of the report, and the record as a whole.

The assignment lacks merit since from the findings of fact there appears that the trial court relied, insofar as the history of the operation is concerned, on the photostatic copy of the history dictated by Dr. Womble during the operation and signed by him, and not on the copy of the same made by nurse Muñoz, which appears with interlineations and other alterations.

■ 8.—Appellant assigns that the most rational, fair, and juridical balance of the evidence as a whole implies a conclusion different from the one reached by the trial court.

The summary of the evidence we have made and the analysis thereof do not support this assignment.

It suffices to repeat that according to the evidence the trial court was justified (1) in giving no credit to Dr. Womble's alleged admission of negligence as well as to Dr. Graubard's testimony; (2) on the contrary, in giving credit to the testimony of Dr. Rodríguez and Dr. Castañer in the sense that the fistula is an inherent risk in a hysterectomy even when the greatest care and skill are exercised in accordance with the practice accepted and followed by the medical profession in these cases; (3) in not applying the doctrine of *res ipsa loquitur* in harmony with the decision in *Siverson* v. *Weber, supra;* and (4) in concluding that Dr. Womble did not incur carelessness or negligence during appellant's operation which would justify at law imposing liability on him and on appellee hospital for the damages suffered by appellant.

In view of the foregoing the judgment of the trial court dismissing the complaint in this case will be affirmed.

Mr. Justice Hernández Matos dissented. Mr. Justice Dávila did not participate herein.